**EDUCATIONAL TESTING
SERVICE, et al.**

v.

**STANLEY H. KAPLAN, EDUCATIONAL
CENTER, LTD.**

**Civil No. JFM–94–3644.**

United States District Court,
D. Maryland.

June 2, 1997.

Henry R. Lord, Piper & Marbury, Baltimore, MD, Jeffrey F. Liss, Washington, DC, for plaintiffs.

William J. Murphy, Baltimore MD, Kevin T. Baine, Dennis Black, Williams & Connolly,

Washington, DC, Aron U. Raskas, Kramon & Graham, Baltimore, MD, for defendant.

## OPINION

MOTZ, Chief Judge.

During the second half of 1994, twenty-two employees of Stanley H. Kaplan Educational Center, Ltd. ("Kaplan") took a computerized version of the Graduate Record Examination ("GRE"), known as the GRE–CAT, given by the Educational Testing Service ("ETS"). Through this organized effort Kaplan proved that questions on the GRE–CAT reappeared with sufficient frequency that they could be memorized by test-takers and passed on to others who had not yet taken the examination. Kaplan brought its findings to ETS' attention, and in response ETS took steps to cure the security problem that Kaplan had identified.

ETS was initially appreciative of what Kaplan had done. However, within a matter of weeks, apparently having become upset by what it perceived as Kaplan's deceitful methods of investigation, unseemly motives and public (and less than honest) boastfulness, ETS filed this lawsuit.[1] Discovery has been completed, and the parties have now filed cross-motions for summary judgment.

### I.

### A.

For over fifty years ETS has prepared and administered a variety of standardized exams, including the GRE, the Scholastic Assessment Test, the Test of English as a Foreign Language, the Graduate Management Admissions Test, and the Advanced Placement Exams. Traditionally, these tests were given in pencil and paper format. In 1992 ETS began to offer the GRE in a computerized version known as the GRE–CBT. This version was, in effect, the traditional pencil and paper test on a computer.

In November 1993 ETS began to give the GRE–CAT. The GRE–CAT differs from the GRE–CBT in that it uses an adaptive software program to present new questions to the test-taker based upon her answers to the previous questions. The more successful the test-taker is in answering successive questions, the more difficult the following questions become. The final score is determined not simply by the number of questions answered correctly, but also by the relative difficulty of the questions. Because of the manner in which the test is structured, it is approximately only one-half as long as the traditional pencil and paper test.

One of the perceived advantages of the GRE–CAT was that it would not have to be given on a set day, as required for pencil and paper tests, but at any time chosen by the examinee. This was so because conceptually no two test-takers would be given the same exam. The reality of this concept depended upon there being a sufficiently large pool of questions and a sufficiently sophisticated software program to assure that the same questions did not regularly reappear. Since it was contemplated that the GRE–CAT would be given on a continuous basis, achievement of this reality was obviously problematical and there were those within ETS who were concerned about the security of the test during the time that it was being placed upon the market.

In the summer of 1994 ETS announced that in February 1995 it would not be giving the GRE in pencil and paper format as it usually did in February of each year. This meant that those who wanted to take the exam in that format would have to do so in December 1994 or in April 1995. Otherwise, they would have to be prepared for the GRE–CAT.

### B.

Stanley Kaplan started the test preparation firm which now bears his name in 1938 in his family's basement. Kaplan is today the world's largest test preparation firm. As described by Fred Danzig, one of Kaplan's former vice-presidents, over the years Kap-

---

1. Joining ETS as plaintiffs in the suit are the Graduate Record Examinations Board, an unincorporated educational association formed by ETS to establish policy for the GRE program, and Sylvan Learning Systems, Inc., which is partially owned by ETS and which administers the computer version of the GRE pursuant to a contract with ETS.

lan and ETS enjoyed a relationship of "mutual respect." Since 1984 Kaplan has been a subsidiary of the Washington Post Company.

In July 1994 Jonathan Grayer, who had joined Kaplan at the end of 1991, became the company's president and CEO. In an internal memorandum prepared in December 1994 (after Kaplan had presented the findings of its investigation into the GRE–CAT) Nancy Cole, the president of ETS, described Grayer as "young, brash, and arrogant, but smart and smooth." Upon assuming his new position Grayer brought on a new management team, replacing what Jose Ferreira (who plays a prominent part in this case) has described on deposition as "the old guard" with "the new regime."

Ferreira originally came to work for Kaplan as an instructor and academic coordinator in San Francisco. In August 1993, Grayer and Robert Greenberg (who later became Kaplan's executive vice-president under Grayer's new regime) hired Ferreira as Kaplan's GRE Product Director in the company's Manhattan corporate headquarters. Ferreira quickly made a name for himself by developing a strategy for answering (without using the problem-solving skills being tested) a series of "pattern-i.d." questions that ETS included on an experimental basis on the October 1993 GRE. Danzig, who was still a vice-president of Kaplan at the time, contacted ETS after the October exam was given about the strategy that Ferreira had developed. After meeting with Danzig and Ferreira ETS withdrew the series of questions from future examinations.

### C.

It was in August 1993 that Ferreira became Kaplan's GRE Product Director. He was very conscious of Kaplan's need to develop the capability to teach its students the methods for taking computerized tests, particularly the GRE–CAT. He perceived that over time ETS would be converting its tests to an adaptive computerized format. He was also concerned that Kaplan's chief competitor, The Princeton Review, might gain an increasing share of the test-preparation market if Kaplan languished in developing new software and teaching programs. At the same time, he saw a tremendous market opportunity for Kaplan since it had greater computer and capital resources than did The Princeton Review and Kaplan's other competitors.

In a series of memoranda that Ferreira sent to his superiors over the course of the next year, Ferreira promoted various plans and projects to put Kaplan ahead of the curve in regard to computerized testing. Some of Ferreira's efforts bore fruit. For example, when in May 1994 ETS released to the public a GRE–CAT software tutorial which it had been providing to examinees (but only on the day of the test), Ferreira persuaded Kaplan management that Kaplan should purchase the tutorial and provide it to its students free of charge.

May 1994 was also the month in which a hearing on computerized testing was held before the New York State Senate Higher Education Committee. There were two aspects of the hearing that, at least as a matter of background, are germane to the present controversy. First, Kaplan's desire to gain as much knowledge as it could about the GRE–CAT was reflected by the testimony that Danzig gave on its behalf requesting that ETS publicly disclose the items appearing on the GRE–CAT at least twice a year. Second, Kaplan and others raised questions about the security of the GRE–CAT because, given the test's continuous nature, test-takers could pass on to subsequent examinees the questions that were asked. ETS assured the committee that the examination was secure because "[t]he GRE program has chosen to use many pools of questions simultaneously." As subsequent events proved, this assurance was ill-founded.

### D.

In August 1994 Ferreira sent three Kaplan employees to take the GRE–CAT and took the examination himself soon after. Although Ferreira has testified that as early as the spring of 1994 he received anecdotal reports that examinees were seeing the same questions on the tests, he says that he discounted these reports and was not embarking on a security investigation in August. The employees whom Ferreira had take the

test corroborate his claim. According to their deposition testimony, they were "to get ... a feel for the test as a whole and the content," to look for such things as whether graphs on the CAT were less complicated because of the restrictions of the computer screen, whether the proportional distribution of question types was the same as on the pencil and paper version, in short "to just get a feel for the overall test." [2]

Ferreira was planning the development of a training course for persons who would be forced to take the GRE in computerized format during the four-month window between December 1994 and April 1995, when the pencil and paper version would not be given by ETS. This was the reason he directed Kaplan employees to take the GRE–CAT in August. However, according to his testimony, although he did propose the development of such a course to Robert Greenberg, he "didn't feel that having a CAT course in place was really crucial until 1996, because that's when the market would really demand it." Given the aggressiveness with which Ferreira had pursued the development of a GRE–CAT course throughout the previous year, this testimony might appear somewhat suspect. However, the evidence is uncontradicted that when presented with Ferreira's proposal Greenberg rejected it on the ground that the market would not support having a separate GRE–CAT course until everyone (or almost everyone) was taking the GRE in the GRE–CAT format.

Ferreira has testified on deposition and by way of affidavit that reports he received from the Kaplan employees who took the GRE–CAT in August caused him to question whether there was a sufficient number of questions in the question pool—or sufficient

variation in students' tests—to ensure test security. However, according to his deposition testimony, during the period from the end of August to the end of October he primarily devoted his time and attention to Kaplan's basic "footprint" GRE course (which was focused on the content, not the form, of the test) and placed any work on the GRE–CAT on the back burner. There is no evidence contradicting this testimony.

On October 28 another Kaplan employee took the GRE–CAT at Ferreira's direction. Two other employees did the same on October 31 and November 15. At the beginning of October ETS had begun to use a second pool of questions (after having used the first pool continuously since its introduction of the GRE–CAT in November 1993). Therefore, these three employees did not see the same questions as did Ferreira and the other Kaplan employees who had taken the GRE–CAT in August. However, according to Ferreira's affidavit, "[a]fter these three individuals provided me with lists of questions that they remembered, I was able to confirm that there was indeed high overlap in the questions that they saw. It also appeared that with relative ease these individuals had been able to assemble a large number of questions that appeared on the exam."

In mid-November Ferreira reported to his immediate superiors, and then to Grayer, his conclusion that there was a security problem with the GRE–CAT. Grayer decided that Ferreira should recruit more test-takers in geographically diverse locations to determine whether the problem was a national or regional one. Ferreira did so, and at the end of November and the beginning of December fifteen more Kaplan employees took the GRE–CAT.[3] Based upon the information

2. ETS contends that the test-takers were attempting to memorize the questions in order to develop "similar but different" questions for Kaplan's training materials. ETS further contends that this process, known as "SBDing," is unlawful if it is done from questions on current tests that have not yet been released by ETS to the public. Several of ETS' own witnesses do not accept this proposition, and it is of dubious legal merit. *See Educational Testing Services v. Katzman,* 793 F.2d 533, 542 (3d Cir.1986). In any event, it fails as a matter of fact since there is no evidence that Kaplan actually SBDed any question from the GRE–CAT at any time.

3. ETS speculates that Kaplan had these employees take the test to obscure the fact that it had earlier sent in other employees to "steal" questions. Aside from the fact that there is no evidence that Kaplan used any questions other than to prove the security breach, Kaplan cogently asks "obscure from whom?" There is no evidence that anyone outside of the Kaplan organization itself knew of the earlier instances of test-taking by Kaplan employees.

that was reported back to him by the test-takers, Ferreira compiled a list of approximately 200 questions that were then on the GRE–CAT.

### E.

On December 8, 1994 Grayer placed a telephone call to Nancy Cole, the president of ETS, and left a message that he needed to speak to her urgently. He left the same message the next day. When Cole returned his call that afternoon, he told her of the results of Kaplan's investigation, offered to send her the questions that had been compiled and arranged a meeting in the offices of Kaplan's legal counsel the following Monday. On December 10—the last day on which the GRE was to be offered in pencil and paper format until April 1995—Cole received from Kaplan the list of 200 questions that Kaplan had learned from the GRE–CAT. As a *coup de grace* Ferreira had formatted them so that it appeared they came directly from ETS' data base.[4]

On December 12 the meeting between representatives of ETS and Kaplan was held as scheduled. ETS expressed appreciation to Kaplan for the manner in which it had handled the situation. Grayer explained that the questions on the lists had come from Kaplan employees who memorized them. Grayer also insisted that ETS stop administering the GRE–CAT immediately. Over the next few days Grayer and Cole spoke over the telephone several times. Allegedly, Grayer again insisted that ETS stop administering the GRE–CAT, and he threatened to go to the press if ETS failed to do so immediately. Cole allegedly said something to the effect that "you don't have what you think you have; your questions are old." Allegedly in response to that comment, Kaplan had two more of its employees take the GRE–CAT. These employees confirmed that the same questions were being used.

ETS announced on December 15 that it was suspending the GRE–CAT for the last week of December 1994. In its press release ETS acknowledged that Kaplan had in-

formed ETS the previous Monday "that it had sent its representatives to take GRE computer tests over a several-week period to memorize significant portions of the GRE questions. The Kaplan organization stated that it will not use the questions in its test preparation classes." The press release quoted Cole as saying "[w]e at ETS appreciate the opportunity to meet with Jonathan Grayer of the Kaplan organization to discuss matters of mutual concern." On December 16 Kaplan issued its own press release entitled "ETS Pulls Computer GRE after Kaplan Investigation Reveals Security Flaws—Lack of Security Undermines Selection at American Universities." The same day Kaplan sent a letter to the deans of over 80 colleges and universities questioning whether ETS could solve the GRE–CAT's security problems within a short period of time. Kaplan also sent a letter to a staff member of the New York State Senate Higher Education Committee (which had held the May 1994 hearing at which the security of the GRE–CAT had been questioned) enclosing ETS' and Kaplan's press releases and various articles which had appeared about the matter. Later, Kaplan developed an advertisement promoting its research capabilities based in part upon its bringing to light security flaws in the GRE–CAT.

Some of the articles which were written contained statements from Kaplan representatives which appear not to have been truthful. For example, Grayer is quoted as saying "[w]e were hearing the same questions over and over from our students.... It became apparent that the test had been almost completely violated." Another article stated that Grayer said: "[a]s we began helping students, we could tell right away that students were passing along questions from the test." Ferreira is quoted as saying: "[t]here was no organized plan. The key was, 'Can people cheat?'" To the same effect he said: "[w]e didn't do anything a normal student couldn't do."

As it had announced it would do, ETS suspended the GRE–CAT for the last week

---

**4.** Of course, as Ferreira knew, upon analysis ETS would determine that the questions on the list had not come directly from its data base since their content was based solely upon the memories of the Kaplan test-takers.

of December 1994. In January 1995 it gave the exam only the first three weeks of the month instead of every week. From February through August 1995 testing was limited to two or three weeks per month, depending upon demand. Beginning in January ETS began to rotate pools of questions, and it accelerated the development of new question pools. It also conducted a series of studies on such issues as question overlap, the score gain that could be expected from an examinee's foreknowledge of the questions, the ease with which questions could be memorized and the detection of suspicious answer patterns.

## II.

■ ETS' primary claim is for copyright infringement. At first glance this claim seems counterintuitive since the only publication of the copied material was to the holder of the copyright. There is also an apparent incongruity between the nature of ETS' claim and the four specific factors listed in 17 U.S.C. § 107 to be considered in connection with the "fair use" defense.[5] However, although the species seen here may be rare, the genus is common. Copyright protection clearly is provided against exploitation of a creative work where that work is copied and is unfairly used. Here, the acts of copying are undenied and quintessential issues of fact are presented as to whether Kaplan's use of the copied material was fair—an issue on which Kaplan bears the burden of proof. *See College Entrance Examination Bd. v. Pa-*

*taki,* 889 F.Supp. 554, 564–65 (N.D.N.Y.), *modified on recons.,* 893 F.Supp. 152 (N.D.N.Y.1995). Therefore, neither side is entitled to summary judgment on ETS' copyright claim.

I will dispense with a lengthy discussion of the four factors traditionally associated with the fair use defense now codified by statute. Valuable as those factors usually are, to limit one's focus to them here would confuse rather than aid analysis since they have been derived from and are geared toward more typical copyright cases. Instead, in keeping with fair use's role as an "equitable rule of reason," *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985), I will simply describe from a broader perspective why Kaplan's use of the questions it copied from the GRE–CAT could be found to be unfair. Citing the legislative history of section 107, the Supreme Court has made it clear that in enacting the statute Congress "intended that courts continue the common-law tradition of fair use adjudication" and that the fair use doctrine thus "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994) (quoting *Stewart v. Abend,* 495 U.S. 207, 236, 110 S.Ct. 1750, 1767, 109 L.Ed.2d 184 (1990)).[6]

---

5. Section 107 provides that the fair use defense can be asserted when copies are made "for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research." 17 U.S.C. § 107. Courts addressing the defense are to consider, *inter alia:*

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

6. To the extent that the four statutory factors have relevance, they are inconclusive. "The purpose and character of the use" depend upon Kaplan's goals and intent—matters as to which there clearly is a genuine dispute of fact. "The

nature of the copyrighted work" on its face appears to favor ETS since the GRE–CAT questions clearly had not been publicized by ETS and indeed were intended to be kept confidential. However, the use to which Kaplan put the questions did not disclose their content to third parties, making the confidential nature of the questions less important. "The amount and substantiality of the portion used in relation to the copyrighted work as a whole" really does not "fit" here since it is addressed to the prototypical case where the creative work of one person has, more or less, been incorporated into the work of another. "The effect of the use upon the potential market for or value of the copyrighted work" seems to require inquiry into the question of how long ETS could have maintained the pool of questions from which Kaplan made its copies but for Kaplan's actions—a question as to which there is a genuine dispute of fact. In any event, it seems to me that this

In my view all that occurred before late October of 1994 is mere background. It was then that Ferreira (for reasons that are not entirely clear) directed two more Kaplan employees to take the GRE–CAT. On November 15 Ferreira had a third employee do the same. When these employees reported back to him, Ferreira concluded that the security of the GRE–CAT could be breached. He reported what he had learned to his superiors and, as a result, Grayer directed Ferreira to recruit more employees to take the test in an organized effort to prove that there was a large number of reappearing questions that could be memorized and passed on. When this effort was successful, Kaplan compiled a list of 200 questions from the exam.

Without more these actions would not have constituted a copyright violation because of the fair use defense. If Kaplan had simply advised ETS of the security problem, no reasonable person would conclude that it had acted wrongfully. But that is not all that Kaplan did. It hired a public relations firm to assist it in a publicity campaign. It wrote a letter to deans of 80 colleges and universities suggesting that ETS' response to Kaplan's investigation was inadequate. It advertised its "research capabilities" based, in part, upon its copying of the GRE–CAT questions. It arguably overstated the extent of the security problem and made misleading (if not actually false) statements to the press understating the extent of the organized effort which had been required to find and copy reappearing questions.

One can conclude that this was all fair game, that Kaplan hired the public relations firm only in anticipation that press releases negative to Kaplan would be forthcoming from ETS, that in any event Kaplan was entitled to tell the world its version of what it had accomplished and publicly to promote its abilities, and that any half-truths or untruths resulted from misunderstandings or simply

are part of robust public debate about an issue of public concern.

However, a factfinder might equally conclude that something more insidious occurred. It might find that when Ferreira, Grayer, Greenberg and the other members of Grayer's "new regime" met with one another after Ferreira reported that he believed that the security of the GRE–CAT could be breached, they hatched a plan to exploit ETS's copyrighted questions for their own business advantage. It might find that Ferreira had been concerned ever since he became Kaplan's GRE Product Director more than a year before that Kaplan was far behind where it needed to be in preparing courses and course materials for adaptive computerized testing. It might find that he persuaded the members of Kaplan's senior management that proving that the security of the GRE–CAT could be breached provided a means to discredit and derail adaptive computerized testing at least for a while, giving him time to develop a better GRE–CAT product. It might find that it was such arguments that persuaded Grayer to authorize what on its face seems to have been a rather grand and unusual venture, having more than a dozen Kaplan employees take the GRE–CAT within a several-week period across the nation.

One could further find that after this venture proved successful, Grayer, Ferreira and their associates developed their plans further. Perhaps they were concerned that although they had been able to prove that a large number of questions could be copied, the effort which was required to copy the questions was so vast and organized that when confronted with Kaplan's proof, ETS could responsibly respond that only modest remedial efforts were required—particularly since any copying and use of questions from the GRE–CAT by Kaplan, the Princeton Review or any other test preparation firm for teaching purposes would constitute a clear

question is beside the point. Even if Kaplan may have caused the premature demise of the pool of questions used on the GRE–CAT from October through December 1994, it may have ultimately enhanced the value of the GRE–CAT as a whole by providing the catalyst to make the test more secure. But while that is a factor that

the factfinder, as a matter of common sense, may ultimately take into account in determining the legitimacy of Kaplan's fair use defense, it does not in and of itself justify Kaplan's exploitation of ETS' product for its own economic advantage. To hold otherwise would be to accept the proposition that the ends justify the means.

violation of federal copyright law.[7] This response would not serve Kaplan's interest in discrediting and derailing the test to give Kaplan time to develop further its GRE–CAT product. Perhaps, therefore, it concluded that it would have to engage in a publicity campaign intended to put ETS on the defensive in the debate about adaptive computerized testing.[8] Grayer, Ferreira and the others may also have concluded that at least an ancillary benefit of the publicity would be that they would be able to promote Kaplan's research expertise, just as they had done in connection with the "pattern-i.d." question episode.

Arguably, Kaplan's intent was manifested in that which eventually unfolded. ETS responded to the results of Kaplan's investigation by withdrawing the GRE–CAT for the last weeks of December, limiting the number of times that the test would be given in 1995 before additional pools of questions could be developed, using rotating pools of questions and taking other limited security precautions. However, these curative actions were less than the full withdrawal of the GRE–CAT that, at least according to ETS' witnesses, Kaplan was insisting upon in the series of December meetings following Kaplan's presentation of the results of its investigation. In one of those meetings Grayer allegedly threatened to go to the press if ETS did not stop administering the GRE–CAT. On December 15, 1994, ETS publicly announced that Kaplan had demonstrated that its employees had been able to memorize significant portions of the GRE–CAT questions over a several week period, that ETS was implementing various new security measures as a result but that it remained firmly committed to computer-based testing

and would continue to give the GRE–CAT, albeit on a more limited basis. The following day Kaplan issued a press release of its own, ominously captioned "ETS Pulls Computer GRE after Kaplan Investigation Reveals Security Flaws—Lack of Security Undermines Selection at American Universities." In the release Kaplan reserved judgment on the question whether the "short-term solutions implemented by ETS" would be sufficient.

One might conclude that there was nothing wrong about Kaplan's press release and that it was simply intended to clarify Kaplan's position in the wake of ETS' press release the day before. One might, however, have substantial questions about the "Dear Dean" letter which Kaplan sent to deans of 80 colleges and universities on the same day it issued its press release. In that letter Grayer wrote:

> We are encouraged by ETS' prompt action and we believe that ETS is taking the security issue seriously. However, we are concerned that the CAT's security problem is systemic and cannot be adequately remedied by short-term measures. Before this matter became public, we urged ETS to pull the exam for a sufficient period of time it could to make major and substantive revisions to it. While we do not wish to prejudge the measures that will be incorporated by early January, we can only adopt a "wait and see" attitude at this time.

It may be, as Kaplan posits, that as a disinterested observer it was only concerned about bringing to the attention of American educators a problem that it perceived in the GRE testing process. A factfinder could,

---

7. In this regard one might find that Kaplan's public pronouncements that it did not intend to use the questions it had copied in its training materials—so apparently magnanimous on their face—were in fact disingenuous. If Kaplan had used the questions for that purpose, ETS obviously would have learned about it. One of its responses would have been equally obvious: it would have filed an action seeking injunctive, declaratory and monetary relief in a federal district court. What Kaplan's defense in such an action would have been is not immediately self-evident.

8. Kaplan contends that it cannot reasonably be inferred from the evidence that it was motivated by a concern about the GRE–CAT because it had earlier decided that there was not enough of a market for a GRE–CAT course during the "four month window" from December to April when no pencil and paper exam was to be given. Kaplan certainly is free to make this argument at trial. However, there is also sufficient evidence for ETS to argue that what was motivating Kaplan was not a short-term decision about a particular course but a longer-term concern about buying time to catch up on its computerized product.

however, conclude that the purpose of this letter was to create an unnecessarily high level of anxiety among college and university administrators about the security of the GRE–CAT so that these administrators would exert pressure upon ETS to withdraw the computerized test—a result which, as stated above, one could find Kaplan believed was in its economic interest to pursue.

Also potentially significant were the apparently misleading and perhaps false statements which Kaplan made to the press during the following weeks. For example, Ferreira was quoted as saying that what Kaplan had done was "very easy," that "there was no organized plan," and that "[w]e didn't do anything that a normal student couldn't do." On their face these statements seem puzzling, coming from a man and a firm who are not shy about promoting themselves. One possible answer to this apparent paradox is that Kaplan was overstating the ease with which the GRE–CAT could be compromised, thereby exaggerating the security risks which it posed, for the purpose of forcing ETS to withdraw it from the market.

I have stated the possible findings that might be made at trial against Kaplan not because I believe the evidence would compel such findings (otherwise I would grant summary judgment for ETS) but because the unusual nature of this case requires a rather full factual exposition as to why Kaplan's use of the questions on the GRE–CAT given from October through December 1994 could reasonably be found to be unfair. In the abstract there is certainly nothing wrong with a test preparation firm conducting an investigation to check on the security of the test, bringing the results of its investigation to the attention of the testing organization, enjoying favorable publicity because of the public service that it rendered or promoting its accomplishments and the expertise those accomplishments reveal. However, all of these acts take on an entirely different color if the test preparation firm embarked upon a deliberate venture to sabotage the test, over-

stated the degree to which the security of the test could be breached, and provided misleading or false information to the public concerning the extent to which it undertook a highly organized effort to effect the breach, all for the purpose of furthering its own economic self-interest.

However energetic, however bright, however enterprising Ferreira, Grayer, Greenberg and their colleagues at Kaplan may have been, the success of all their efforts in proving that questions on the GRE–CAT reappeared depended in the first instance upon their copying the copyrighted material of ETS. This copying was a violation of the copyright law unless the use to which Kaplan put the copied material was fair. This question must be resolved at trial.

### III.

ETS' remaining claims are for breach of contract, fraud and violations of the Federal Stored Wire and Electronic Communications and Transactional Record Access Act (the "Stored Communications Act").[9] These claims need to be only briefly addressed.

### A.

The contract and fraud claims are based upon a confidentiality statement (reinforced by confidentiality warnings appearing on the computer screen at the commencement of the test) signed by all persons who take the GRE–CAT. A substantial question is presented as to whether the statement provides a legally binding obligation. Although similar statements have been held to be binding, the cases so holding have arisen in the context where the statement was signed and submitted by the test-taker when she sent in her application and fee. *See, e.g., Yaeger v. Educational Testing Serv.,* 158 A.D.2d 602, 551 N.Y.S.2d 574, 576 (1990); *K.D. v. Educational Testing Serv.,* 87 Misc.2d 657, 386 N.Y.S.2d 747, 749 (Sup.Ct.1976). In contrast, persons can register for the GRE–CAT by telephone, and the confidentiality statement is not presented to them until the day

---

9. ETS also asserts a claim under the Maryland version of the Stored Communications Act. That statute is inapplicable, however, because there is

no evidence that any Kaplan employee took the test in Maryland.

of the test when they have already paid their fee and no longer have the right to a refund.

By that time under traditional doctrine the contract between ETS and the test-taker has been completed and the confidentiality statement would not be enforceable because it is not supported by new consideration.[10] *Cf. Lennon v. United States Theatre Corp.*, 920 F.2d 996, 1001 (D.C.Cir.1990). Moreover, even if the confidentiality statement is binding, there is a question as to whether it covers the conduct in which Kaplan engaged. ETS itself admits that the statement cannot be read literally to encompass, for example, the disclosure of test questions for the purpose of proving alleged racial bias in the examination.

■ I need not decide these questions, however, because there is a far more fundamental defect in ETS' contract and fraud claims: ETS has failed to demand (much less prove) any damages or other relief in regard to them. This may well be by design since arguably any harm suffered by ETS would at least be offset by the benefit that Kaplan bestowed by taking steps leading to the enhancement of the GRE–CAT's security. In any event, it is not the business of the courts to decide legal issues solely as an academic exercise.

### B.

■ The Stored Communications Act prohibits "(1) intentionally access[ing] without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceed[ing] an authorization to access that facility; ... and thereby obtain[ing] ... a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). ETS argues that Kaplan violated this statute by exceeding the authorization embodied in the confidentiality statements when it copied and disclosed the GRE–CAT questions. By disregarding the terms of the statements, ETS claims, Kaplan's employees exceeded the conditional access granted by ETS, turning the employees into "electronic trespassers" whose conduct is covered by the Act.

[4] This argument is, of course, based upon the premise that Kaplan's employees did violate the confidentiality statements—a premise which, as pointed out above, is very much in doubt. However, even if they did so, it appears evident that the sort of trespasses to which the Stored Communications Act applies are those in which the trespasser gains access to information to which he is not entitled to see, not those in which the trespasser uses the information in an unauthorized way. The Senate Report explaining the statute also supports this reading, giving examples of unauthorized access. The report states, for example, that a subscriber to a computer mail facility would violate the statute by accessing the electronic storage of other subscribers to the facility without specific authorization to do so. S.Rep. No. 99–541, at 9 (1986). Similarly, a member of the general public authorized to access the public portion of a computer facility would violate the statute by exceeding this authorization and accessing the private portions of the facility. *Id.* Put another way, the wrongful acts targeted by the Stored Communications Act are those committed while a user is in electronic "contact" with a computer facility, not those committed after the user has signed off.

### IV.

For these reasons ETS' summary judgment motion is denied as to all claims. Kap-

---

10. This result may seem somewhat unreasonable because test-takers reasonably should anticipate that they will be required to keep test questions confidential. Otherwise, the test would be worthless since honest examinees would be at a substantial disadvantage to cheaters who knew the test questions in advance. However, ETS also requires test-takers to be fingerprinted on the day of the GRE–CAT, apparently without providing them (at least those who have not picked up and read a GRE–CAT booklet) with advance notice of that fact. It is less likely that all examinees would anticipate this requirement, and some may object to it as a matter of principle. It would seem that ETS might be well advised either to provide test-takers who object to conditions of which they are not expressly advised until the day of the test with the right to a full refund of the test fee, or to include a statement of all the conditions that will be imposed on test day in the information which is orally communicated when a test applicant registers over the telephone.

lan's summary judgment motion is granted as to the claims for breach of contract, fraud and violation of the Stored Communications Act (and its Maryland counterpart) but is denied as to the copyright infringement claim. A separate order to that effect is being entered herewith.

## ORDER

For the reasons stated in the opinion entered herewith, it is, this 2nd day of June, 1997 ORDERED

1. Plaintiffs' summary judgment motion is denied as to all counts; and

2. Defendant's summary judgment motion is denied as to plaintiffs' claim under the Copyright Act (Count I), and granted as to plaintiffs' claims for violation of the federal and Maryland Stored Wire and Electronic Communications and Transactional Record Access Acts (Counts II and III), breach of contract (Count IV) and fraud (Count V).