19-1109(L)
*Yukos Capital S.A.R.L. v. Feldman*

United States Court of Appeals
for the Second Circuit

August Term 2019

(Argued: February 28, 2020          Decided: October 8, 2020)

Docket Nos. 19-1109(L), 19-1254(XAP)
_____

YUKOS CAPITAL S.A.R.L., YUKOS HYDROCARBONS INVESTMENTS LIMITED, STICHTING ADMINISTRATIEKANTOOR YUKOS INTERNATIONAL, STICHTING ADMINISTRATIEKANTOOR FINANCIAL PERFORMANCE HOLDINGS,

*Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants*,

MARK FLEISCHMAN, AS TRUSTEE OF THE 2015 SECURITY TRUST, AS SUCCESSOR IN INTEREST TO THE 2014 SECURITY TRUST,

*Plaintiff-Third-Party-Defendant-Counter-Defendant-Appellee-Cross-Appellant*,

LUXTONA LIMITED,

*Plaintiff-Counter-Defendant-Appellee-Cross-Appellant*,

*v.*

DANIEL CALEB FELDMAN,

*Defendant-Third-Party-Plaintiff-Counter-Claimant-Appellant-Cross-Appellee*,

DAVID GODFREY, STEVEN THEEDE, FAIR OAKS TRADE AND INVEST LIMITED,

*Third-Party-Defendants-Cross-Appellees*,

DIRECTORS PROTECTION LTD., FINANCIAL PERFORMANCE HOLDINGS B.V., GRETCHEN KING, MICHEL DE GUILLENCHMIDT, BRUCE MISAMORE,

*Third-Party-Defendants.*[*]

———————————————————

On Appeal from the United States District Court
for the Southern District of New York.
No. 15-cv-4964 – Lewis A. Kaplan, *Judge*.

———————————————————

Before:

LIVINGSTON and PARK, *Circuit Judges*, and UNDERHILL, *District Judge*.[‡]

Defendant-Appellant, Daniel Feldman, appeals from two judgments—one following a jury trial and one at summary judgment—entered by the United States District Court for the Southern District of New York (Kaplan, *J.*). Regarding the first, Feldman argues that the district court erred in allowing the jury to consider certain of the breach of fiduciary duty claims against him. Regarding the second, Feldman argues that the district court erred in granting summary judgment to a Third-Party-Defendant-Cross-Appellee, David Godfrey, on Feldman's third-party claim under the Stored Communications Act. Plaintiffs-Appellees, Yukos Capital S.A.R.L., *et al.*, cross-appeal from the district court's decisions (1) not to impose discovery sanctions on Feldman and (2) to instruct the jury on the incorrect standard regarding disgorgement of a faithless servant's compensation. We **AFFIRM** in all respects except one; we **REVERSE** in part because we agree with Feldman that the district court's decision to allow the jury to consider certain breach of fiduciary duty claims brought by (1) Stichting Administratiekantoor Yukos International and (2) Stichting

---

[*] We respectfully direct the Clerk of Court to amend the official caption in accordance with this opinion. Specifically, two Plaintiffs-Appellees were incorrectly referred to as "Stitching," rather than "Stichting." Also, the group of four Plaintiffs-Appellees were incorrectly referred to as "Plaintiff-Counter-Defendants-Appellees-Cross-Appellants." Because there are several such entities, they should be referred to in the plural: "Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants."

[‡] Judge Stefan R. Underhill, United States District Judge for the District of Connecticut, sitting by designation.

Administratiekantoor Financial Performance Holdings was error.  Thus, we **AFFIRM** in substantial part and **REVERSE** in part.

JEFFREY D. BROOKS (Mary E. Flynn, *on the brief*), Morrison Cohen LLP, New York, NY, *for Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants, Plaintiff-Third-Party-Defendant-Counter-Defendant-Appellee-Cross-Appellant, and Third-Party-Defendants-Cross-Appellees*.

ROBERT GLUNT (Rishi Bhandari, *on the brief*), Mandel Bhandari LLP, New York, NY, *for Defendant-Third-Party-Plaintiff-Counter-Claimant-Appellant-Cross-Appellee*.

UNDERHILL, *District Judge*:

This is a case about a disloyal employee, Daniel Feldman, the Defendant.[1]

After trial, a jury found that Feldman had, through his actions in two distinct schemes, breached his fiduciary duty to (1) Yukos Capital S.A.R.L. ("Yukos Capital"), Yukos Hydrocarbons Investments Limited ("YHIL"), Stichting Administratiekantoor Yukos International ("Foundation 1"), and Stichting Administratiekantoor Financial Performance Holdings ("Foundation 2") (together, the "Yukos Group"),[2] and (2) Mark Fleischman, as Trustee of the 2015

---

[1] Feldman is Defendant-Third-Party-Plaintiff-Counter-Claimant-Appellant-Cross-Appellee.  For ease of reference, we refer to him as the Defendant.

[2] The Yukos Group, as defined above, are Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants.

3

Security Trust, as successor in interest to the 2014 Security Trust.[3]  (The Yukos Group and Fleischman, together with Luxtona Limited,[4] are the "Plaintiffs.")

Neither the Yukos Group nor Fleischman had sought compensatory damages for Feldman's alleged breaches, and the jury declined to award them any disgorgement of Feldman's compensation pursuant to New York's faithless servant doctrine; accordingly, the district court awarded the Yukos Group entities and Fleischman each $1 in nominal damages (for a total of $5).

Feldman appeals from the district court's decision to deny his Rule 50 motion for judgment as a matter of law, in which he argued that all breach of fiduciary claims against him for which the Plaintiffs did not allege or prove compensatory damages should have been dismissed.  The Yukos Group and Fleischman appeal the district court's allegedly erroneous jury instructions regarding the level of misconduct necessary to warrant forfeiture of a disloyal employee's compensation under New York's faithless servant doctrine.

Before trial, Feldman brought a third-party claim against David Godfrey.[5] In that third-party claim, Feldman alleged that Godfrey had directed a third-

---

[3] Fleischman is Plaintiff-Third-Party-Defendant-Counter-Defendant-Appellee-Cross-Appellant.

[4] Luxtona Limited is Plaintiff-Counter-Defendant-Appellee-Cross-Appellant.

[5] Godfrey is Third-Party-Defendant-Cross-Appellee.

4

party forensic accounting firm to access Feldman's gmail account without authorization, which violated the Stored Communications Act (the "SCA"), 18 U.S.C. §§ 2701–12. The district court (Kaplan, *J.*) granted Godfrey summary judgment on Feldman's third-party claim. Feldman appeals that ruling.

Also before trial, the district court denied the Plaintiffs' request that it impose sanctions on Feldman for perjurious deposition testimony and improper withholding of documents. The Plaintiffs appeal that decision.

We **AFFIRM** the district court's granting summary judgment to Godfrey, its non-imposition of sanctions, and its decision to instruct the jury as it did regarding the standard for disgorgement of a faithless servant's compensation. However, because we conclude that Foundation 1 and Foundation 2 (together, the "Foundations") failed to prove breach of fiduciary duty claims against Feldman, we **REVERSE** the district court's denial of Feldman's Rule 50 motion with respect to them.

## I. BACKGROUND

A.     Facts

Based in Moscow, the Yukos Oil Company ("Yukos Oil") was founded in the mid-1990s, and it became Russia's largest exporter of crude oil. Beginning in

5

2003, the Russian Federation alleged that Yukos Oil had underpaid its taxes over many years by billions of dollars. Yukos Oil rapidly became bankrupt and its assets were sold at auction. The Plaintiffs believe that the bankruptcy and auction were politically motivated and that the Russian Federation had simply appropriated Yukos Oil's assets. As relevant to this case, some of Yukos Oil's foreign assets were purchased by OOO Promneftstroy ("Promneftstroy").

Before Yukos Oil's dissolution, numerous executives anticipated that the Russian Federation would come for Yukos Oil's assets, and so they formed several legal entities—some of which are the Plaintiffs here—that could take control of billions of dollars of Yukos Oil's international assets to protect those assets for Yukos Oil's shareholders. Those legal entities have fought for control of the former Yukos Oil's foreign assets. For example, in January 2019 in a Netherlands court, the Plaintiffs and their affiliates successfully obtained title to the former Yukos Oil assets that Promneftstroy had "purchased" at auction.

The Defendant in this case—Daniel Feldman—is an American lawyer who worked as a corporate secretary for Yukos Oil. Between Yukos Oil's 2006 dissolution and 2014, Feldman was involved in the leadership structure of several Yukos Group entities. More specifically, Feldman was the corporate

6

secretary for the Foundations. He also served as the sole director of Yukos Capital from 2007 to 2014 and as one of several directors of YHIL from 2006 to 2012. Yukos Capital was a wholly-owned subsidiary of Foundation 1. And YHIL was a wholly-owned subsidiary of Foundation 2. Feldman was also the trustee of the 2015 Security Trust (and its predecessor) from 2006 to 2013.

The Plaintiffs allege that Feldman stole money from them in numerous ways over the years. (At trial, the Plaintiffs alleged that Feldman perpetrated eight separate, duplicitous schemes.) Feldman maintained that this case was a cover-up: The Plaintiffs were fabricating Feldman's disloyalty to hide their own disloyalty. Feldman thus brought counterclaims against the Plaintiffs and third-party claims against several individuals associated with the Yukos Group for SCA violations and defamation. (None of those counterclaims or third-party claims made it to trial, but one is at issue in this appeal.)

Three schemes are relevant here. The first is the Promneftstroy Scheme. As described above, the Yukos Group and its affiliates were engaged in litigation with Promneftstroy in the Netherlands. Due to his personal connections with individuals at Promneftstroy, Feldman was tapped to broker a settlement. The Plaintiffs alleged that Feldman sought a cash payment from Promneftstroy

before negotiating with them. The jury found Feldman not liable for breach of fiduciary duty in the Promneftstroy Scheme, but it is relevant to the discussion below regarding the district court's decision not to impose sanctions.

The second is the Trust Scheme. The Plaintiffs alleged that when Feldman was serving as trustee of the 2004 Security Trust (the "Trust")—a Yukos-affiliated entity that held money for the Yukos Group's future litigation expenses— Feldman withdrew $500,000 and invested it under his own name in a hedge fund for three years. Feldman did not tell the Trust's protector that he was investing the Trust's assets in his own name. When the Trust's protector discovered what Feldman had done, the protector demanded that Feldman return the funds to the Trust's account, and Feldman was removed as trustee. The investment that Feldman made had almost doubled in value. As a result, the Plaintiffs did not seek compensatory damages from Feldman for his role in the Trust Scheme. At trial, the jury found Feldman liable for breach of fiduciary duty in the Trust Scheme.

The third is the Julius Baer Scheme. Julius Baer is a Swiss bank that agreed to hold some of the Yukos Group's assets. A Yukos Group employee—Dmitri Merinson—had secured that arrangement with Julius Baer. Feldman

subsequently approved a $2.6 million "finder's fee" payment from Julius Baer to Merinson. At trial, the Plaintiffs claimed that the "finder's fee" was really a kickback. Indeed, sometime after Feldman approved Julius Baer's $2.6 million payment to Merinson, Merinson "loaned" Feldman $1.2 million so Feldman could buy a house in the Hamptons. The Plaintiffs elicited expert testimony suggesting that the $2.6 million payment to Merinson resulted in Julius Baer's charging the Yukos Group higher rates on certain foreign exchanges; the expert estimated the damage to the Yukos Group to be $3 million. (Feldman contested that characterization.) Still, the Plaintiffs did not seek compensatory damages from Feldman for his role in the Julius Baer Scheme because, before trial, the Plaintiffs had already settled with Julius Baer for the full amount of their out-of-pocket harm. At trial, the jury found Feldman liable for breach of fiduciary duty in the Julius Baer Scheme.

B.    Procedural History

1.    *Summary Judgment*

In October 2016, the Plaintiffs and several Third-Party-Defendants made a motion for partial summary judgment on Feldman's counterclaims and third-party claims, which, as relevant here, asserted a claim under the SCA against

9

David Godfrey,[6] the former general counsel of Yukos Oil and the *de facto* general counsel of the Yukos Group and its affiliates. Feldman claimed that Godfrey had improperly directed a third-party forensic accounting firm to access without authorization certain of Feldman's emails.

In 2014, Godfrey determined that an internal investigation into YHIL was warranted because of potential impropriety by Feldman (and others). YHIL retained the law firm Gibson Dunn & Crutcher LLP ("Gibson Dunn") to conduct the internal investigation. In turn, Gibson Dunn engaged a forensic accounting firm, Crowe Horwath LLP ("Crowe Horwath"). Godfrey instructed all YHIL directors—not only Feldman—to make their business emails and documents available to Crowe Horwath. Because YHIL did not have its own internal email system, YHIL personnel used their personal email accounts to conduct business.

On May 28, 2014, Feldman met with a representative of Crowe Horwath—Tim Bryan—at Crowe Horwath's offices in New York City. Both parties understood that the purpose of the meeting was for Bryan to sit with Feldman and to capture any YHIL-related emails from Feldman's personal gmail account.

---

[6] The district court construed Feldman's SCA claim as against only Godfrey (even though Feldman asserted third-party claims against three Third-Party-Defendants (Godfrey, Fleischman, and Steven Theede)), and Feldman does not contest that determination on this appeal.

Feldman's service as a director of YHIL ceased on September 12, 2012, and so Feldman asked that Bryan download no emails post-dating September 12, 2012. Bryan informed Feldman that he did not have the technical capability to limit his downloads in that way. The parties disagree about whether Bryan then made an explicit promise that, if Feldman allowed Bryan to download his emails wholesale, Bryan and Crowe Horwath would not examine any emails post-dating September 12, 2012. Regardless, Feldman provided his gmail account information, and Bryan downloaded about 6,500 emails, without regard to their dates.

In the days following the May 28 meeting, several emails passed between Bryan and Feldman. On May 30, 2014, Feldman wrote to Bryan and another Crowe Horwath employee:

> As a follow up to my meeting with Tim, I would like to confirm / memorialize that I gave my assent for you to download my emails only with the agreement that you not read any emails past September 12, 2012 as that was my last day working for Yukos Hydrocarbons / YHIL. I asked Tim to not download any emails past that date but he stated that he could not limit the downloads by date.

App'x at 566. On June 2, 2014, Feldman wrote to Bryan and two other Crowe Horwath employees:

Just following up on my previous email and voicemail. Please confirm that you will limit your search up to September 12, 2012 and will not read emails which include . . . my lawyer. I agreed to let Tim download my emails with those conditions. He said that a time limit could not be done mechanically with the program he used.

App'x at 2859 (filed under seal). After Bryan emailed Feldman regarding a different topic on June 5, Feldman emailed Bryan and two other Crowe Horwath employees on June 6:

Please respond to my numerous requests to confirm our agreement that you limit your review of my emails to the time period I was a director of [YHIL]. I am nonplussed that you would repeatedly ignore my requests and then send me the below email and not reference or explain your lack of response and boldly ask for my response "ASAP."

Tim, I appreciate you confirming our agreement to limit your review of my emails, during our phone conversation earlier this week, but I would like it acknowledged by email. This is a threshold issue for me. Otherwise, I feel completely deceived. I took you at your word, which you repeatedly assured me was solid.

App'x at 572. On June 9, 2014, Bryan responded to Feldman:

Regarding the limitation you are seeking, I want to set the record straight regarding our discussion of the email search process that was to commence subsequent to our collection meeting on May 28. During our meeting you requested that I only collect your email for a timeframe which you represented as being your YHIL employment period. I indicated that I could not limit my collection to a specific timeframe but rather could limit the collection based on a set of search terms, which you agreed to. At no time during our conversation at that meeting did I commit to you that any subsequent review of the

email collected would be limited to a specific timeframe. Further, during our brief phone conversation last week, I also did not commit to you that we would limit our review to a specific timeframe.

App'x at 574. In response, Feldman said:[7]

There are so many misrepresentations and incorrect facts in your lengthy email. I am so disappointed in you. You got me to trust you during our meeting. I agreed to let you go through my emails with the understanding that you would put in the date restriction when going through the documents as you said you could not do so during the search. I feel suckered. I guess shame on me for falling for your assurances when I do not know you or your character.

*Id*.

The district court granted the Plaintiffs' and Third-Party-Defendants' motion for summary judgment on Feldman's SCA claim because Feldman's objection to the scope of Crowe Horwath's review of his emails was irrelevant to whether Crowe Horwath committed an SCA violation. The SCA prohibits only "intentionally access[ing] without authorization a facility through which an electronic communication service is provided" and "intentionally exceed[ing] an authorization to access that facility." 18 U.S.C. § 2701(a). The district court explained that Feldman had produced no evidence that Crowe Horwath had

---

[7] It is unclear whether this email was actually sent—there is no "sent" date in the header. *See* App'x at 574.

13

either accessed without authorization—or exceeded the limits of its authority to access—Feldman's account:

> Feldman's emails are entirely clear. They unequivocally and repeatedly demonstrate that he agreed to Crowe Horwath accessing and downloading his emails without restriction as to date, albeit with the understanding that Bryan would not read any email past September 12, 2012. Thus, there was no violation of the SCA because Crowe Horwath did not access Feldman's email without his authority or exceed the authority Feldman gave. While Crowe Horwath, if it *read* emails post-dating September 12, 2012, may have acted inappropriately or even tortiously, it did not thereby violate the SCA, a *sine qua non* of such a violation being improper *accessing* of stored electronic communications, as opposed to *reading* previously and properly accessed communications in breach of an agreement not to do so.

App'x at 705. The district court also rested its decision on an alternative ground: Godfrey could not be held liable for Crowe Horwath's SCA violation (even if there were one) because Crowe Horwath was not acting as Godfrey's agent.

Feldman appeals the district court's decision.

2. *Discovery Sanctions*

In December 2017, the Plaintiffs made a motion asking the district court to impose discovery sanctions on Feldman pursuant to both Federal Rule of Civil Procedure 37 and the court's inherent powers. The Plaintiffs alleged that Feldman had committed perjury in several respects during deposition testimony

14

and also had improperly withheld documents regarding the Julius Baer Scheme that should have been produced in response to the Plaintiffs' requests for production.

The district court denied the Plaintiffs' motion insofar as it sought sanctions pursuant to Rule 37 because a prerequisite of the rule—that the transgressing party must have defied a prior order—was not met. The district court also declined to impose discovery sanctions pursuant to its inherent powers. The Plaintiffs appeal that decision.

The Plaintiffs claimed that Feldman committed perjury regarding the Julius Baer Scheme. At a June 2016 deposition, Feldman denied having ever received any "kickbacks from banks or financial institutions that held Yukos funds" and stated that he did not know whether Dmitri Merinson had received "some form of introductory fee or kickback." App'x at 1133–34. At an October 2017 deposition, Feldman testified that he had (1) received two "loans" from Merinson totaling over $1.2 million, and (2) known about—and personally approved—the $2.6 million finder's fee that Julius Baer paid to Merinson. The Plaintiffs argued that Feldman's October 2017 deposition testimony proved that Feldman had committed perjury in his June 2016 deposition because the $1.2

15

million that Feldman received from Merinson was a kickback, and—because Feldman personally approved Merinson's finder's fee agreement with Julius Baer—Feldman knew that Merinson had received "some form of introductory fee or kickback."

Feldman argued that he testified truthfully because the $1.2 million he received from Merinson was not a kickback but, rather, a loan governed by two promissory notes on which Feldman paid interest. Further, Feldman claimed that he testified that he did not know whether Merinson had received any "introductory fees or kickbacks" because he thought the Plaintiffs' counsel was inquiring about illicit payments, and the finder's fee payment that he approved was not illicit.

The district court denied the Plaintiffs' request to impose sanctions for Feldman's alleged perjury regarding the Julius Baer Scheme. The court noted that it need not decide whether Feldman committed perjury by denying knowledge of the finder's fee agreement "because plaintiffs may impeach Feldman on the stand and accomplish the same end without the imposition of sanctions by the Court." App'x at 1256. The district court also wrote that "[t]he case for sanctions with respect to the alleged loans Feldman received from

16

Merinson is even weaker" because the "Plaintiffs have not presented evidence that is sufficiently persuasive to the Court that the payments were kickbacks rather than loans." *Id.* As a result, the district court remarked, "[t]he nature of the alleged payments is a question for the jury rather than the Court." *Id.*

The Plaintiffs also alleged that Feldman committed perjury regarding the Promneftstroy Scheme. Feldman testified at a December 2015 deposition that he did not "promise to give . . . any [] person or entity associated with Promneftstroy information concerning the Yukos [G]roup" and did not know why Promneftstroy had agreed to pay his legal fees in this case. *See* App'x at 823–25. After that deposition testimony, Feldman produced two cooperation agreements that he had signed with Promneftstroy. In the cooperation agreements—one executed in July 2015 and the other in November 2015—Promneftstroy agreed to pay Feldman's legal expenses in this case, and Feldman "agree[d] to cooperate fully . . . by providing complete and truthful information regarding his role and actions related to" the Yukos Group and its affiliates. App'x at 883, 889. The Plaintiffs alleged that Feldman's explicit obligations under the cooperation agreements—*i.e.*, to provide Promneftstroy with information—prove that he committed perjury in his December 2015 testimony.

17

As a sanction for such conduct, the Plaintiffs asked the district court to cabin Feldman's potential testimony regarding his motivation for seeking assistance from Promneftstroy.

Even though the district court found Feldman's testimony "troubling," it rejected the Plaintiffs' requests for sanctions because it could not "see the point of foreclosing Feldman from testifying as to why he sought assistance from Promneftstroy." App'x at 1257. If Feldman had testified falsely, "the jury presumably will understand that and act accordingly at trial." *Id.*

Finally, the Plaintiffs believed they should have received documents revealing the existence of the Julius Baer Scheme in response to their written discovery requests made in 2015.[8] The Plaintiffs did not learn about the Julius Baer Scheme until after discovery in this case had initially closed, when Julius Baer itself informed the Plaintiffs that Julius Baer had paid Merinson a finder's fee and that Feldman had approved that fee. Feldman argued that he had not withheld anything: The requests the Plaintiffs identified were extremely broad,

---

[8] In particular, the Plaintiffs highlighted three requests: (1) "Documents concerning your role, responsibilities, duties and obligations as a director" of Yukos Capital and YHIL; (2) "All documents concerning the transfer of funds in or out of any accounts belonging to any member of the Yukos Group"; and (3) "All documents concerning any aid, advice or information provided to you by attorneys, accountants and other professionals concerning any aspect of the business, financial affairs or operations of any member of the Yukos Group while you were [a] director . . . ." App'x at 959.

18

and Feldman had not withheld any documents based on their association with Julius Baer. The district court declined to impose sanctions on that ground, too, because the Plaintiffs now had the materials they sought, and they had not established that Feldman had withheld those materials in bad faith.

3. *Trial*

a. Feldman's Rule 50 Motion

After the close of evidence, Feldman made a motion for judgment as a matter of law on the Plaintiffs' breach of fiduciary duty claims for which there was no proof of compensatory damages. The Plaintiffs did not offer evidence of compensatory damages for Feldman's breach of fiduciary duty in either the Trust Scheme or the Julius Baer Scheme. As noted above, the money Feldman invested under his own name in the Trust Scheme nearly doubled in value and was returned to the Plaintiffs. And the money that the Plaintiffs would have sought to recover from Feldman as compensatory damages in the Julius Baer Scheme had already been paid to them pursuant to a settlement with Julius Baer.

The district court denied Feldman's Rule 50 motion apparently because it believed that compensatory damages were not a required element of a breach of fiduciary duty claim and that, in any event, nominal damages could substitute in

19

the absence of compensatory damages. *See* App'x at 2591–92 ("I have reason to think that . . . damages are not an element of the [breach of fiduciary duty] claim. Moreover, if a breach were established, an award of nominal damages would be in order."). The district court also may have viewed "recoupment of compensation" pursuant to the faithless servant doctrine as an acceptable substitute for compensatory damages in a breach of fiduciary duty action. App'x at 2605. Feldman appeals the district court's decision not to award him judgment as a matter of law on the two schemes on which he was ultimately found liable.

          b.     Plaintiffs' Challenge to the Jury Instructions

New York's faithless servant doctrine holds that "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (quoting *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928 (1977)). Pursuant to the faithless servant doctrine, the Plaintiffs sought to require Feldman to disgorge his compensation. The district court's jury instructions directed the jury to award the Plaintiffs disgorgement of Feldman's compensation only if the jury found that Feldman has been disloyal "in substantial respects." App'x at 2773

20

("If you do find that Mr. Feldman acted disloyally in substantial respects . . . , then that plaintiff is entitled to recover the compensation that it paid to Mr. Feldman . . . ."). The verdict sheet was consistent with that instruction. *See* App'x at 2814–15 (asking jury if "Feldman acted disloyally in substantial respects").

The parties had been given opportunities to object to the jury instructions and the verdict sheet. The Plaintiffs made numerous objections to both, but they did not object to the above-referenced language. (The Plaintiffs argue that they did object to that language, but they are incorrect.)[9] Now, the Plaintiffs appeal the district court's decision to instruct the jury as it did.

---

[9] The Plaintiffs point out that they objected to similar language regarding how the jury would *calculate the amount* of Feldman's disgorgement. In particular, the district court was prepared to give an instruction that, once the jury had *already found* Feldman liable under the faithless servant doctrine, the correct amount to award the Plaintiffs in disgorgement would be his compensation "from the date of his first substantially disloyal act . . . through the termination of his employment." App'x at 2661. Feldman objected to that instruction on the ground that the correct amount of disgorgement should be Feldman's compensation only during periods of disloyalty. The Plaintiffs, in turn, objected to Feldman's request to limit the amount of disgorgement in that way. The district court essentially agreed with Feldman and instructed the jury that the correct calculation would be disgorgement "during any periods of substantial disloyalty." App'x at 2665, 2773, 2815 (verdict sheet).

The Plaintiffs' objection in that different context has nothing to do with the issue in this appeal. As courts have recognized, the question of how to measure the amount of disgorgement due under the faithless servant doctrine is analytically distinct from the question of the level of misconduct necessary to justify *any* forfeiture under the faithless servant doctrine in the first place. *See Phansalkar*, 344 F.3d at 200–08 (treating the two questions separately). The second question is what is at issue in this appeal, and the Plaintiffs did not object to that issue below.

21

## II. DISCUSSION

A.      Summary Judgment

The Second Circuit reviews a district court's grant of summary judgment *de novo*. *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). The district court granted the Plaintiffs' and Third-Party-Defendants' motion for summary judgment on Feldman's SCA claim because there had been no SCA violation and, in any event, Godfrey could not be held liable for such a violation as a principal of Crowe Horwath. Feldman appeals that decision. We affirm because there was no SCA violation. Thus, we need not address the district court's alternative holding based on agency law.

Under the Stored Communications Act, whoever "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished." 18 U.S.C. § 2701(a). "[E]lectronic storage" means "any temporary, intermediate storage of a wire or electronic communication

incidental to the electronic transmission thereof," and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." *Id.* § 2510(17). Any person aggrieved by a violation of Section 2701 may bring a civil action against the person or entity that engaged in such violation. *See id.* § 2707(a).

Feldman argues that Bryan exceeded the scope of his authorization to access Feldman's gmail account when Bryan downloaded emails post-dating September 12, 2012. Feldman points out that some courts have held access to be unauthorized in analogous circumstances. For instance, in *Anzaldua v. Northeast Ambulance & Fire Protection District*, the plaintiff had given his gmail account information to his girlfriend so that she could log into his account and forward a resume on his behalf. 793 F.3d 822, 838–39 (8th Cir. 2015). A year later, the plaintiff's now-ex-girlfriend logged back into his account without his knowledge for the purpose of aiding an investigation into him. *Id.* The Eighth Circuit noted that the ex-girlfriend's second access to the plaintiff's gmail account was unauthorized. *Id.* (The Eighth Circuit, however, affirmed the district court's dismissal of the plaintiff's SCA claim on different grounds.)

Feldman also cites several cases—some of which regard a different statute, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030—in which an employee with access to an employer's computer system uses that access, unbeknownst to the employer, to obtain proprietary information and then uses it for his or her own—or a competitor's—benefit. Several courts have allowed such claims to survive motions to dismiss on the ground that the employee exceeded his or her authorization to access the employer's computer system. *See, e.g.*, *Lasco Foods, Inc. v. Hall & Shaw Sales, Mktg., & Consulting, LLC*, 2009 WL 3523986, at *5 (E.D. Mo. Oct. 26, 2009); *Nilfisk-Advance, Inc. v. Mitchell*, 2006 WL 827073, at *2 (W.D. Ark. Mar. 28, 2006) (CFAA); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1124–25 (W.D. Wash. 2000) (CFAA).

Feldman also argues that, even if Bryan obtained his authority to access emails post-dating September 12, 2012, Bryan obtained that authority by deceit, and that is no authority at all. Feldman explains that Godfrey "claimed that access to Feldman's email was necessary to preserve YHIL's business records," but "[t]his was false" because "[i]n reality," Godfrey had the "secret, unauthorized purpose" of "pilfer[ing] Feldman's communications for future use

24

against him." Appellant's Br. at 33–34. Feldman relies primarily on *Theofel v. Farey-Jones*, in which a defendant subpoenaed emails from the plaintiffs' internet service provider ("ISP"). 359 F.3d 1066, 1071 (9th Cir. 2004). The plaintiffs' ISP, unrepresented by counsel at that point, partially complied with the subpoena and offered defendants a sample of the requested messages that included many unrelated, privileged, and personal communications. *See id.* The Ninth Circuit, though, held that the subpoena was invalid because it was so egregiously broad in its requests. *See id.* at 1071–75. Thus, the plaintiffs' ISP's "authorization" had been vitiated because "[t]he subpoena's falsity transformed the access [to emails] from a bona fide state-sanctioned inspection into private snooping." *Id.* at 1073. The *Theofel* court explained: "Permission to access a stored communication does not constitute valid authorization if it would not defeat a trespass claim in analogous circumstances. Section 2701(c)(1) therefore provides no refuge for a defendant who procures consent by exploiting a known mistake that relates to the essential nature of his access." *Id.*

The Plaintiffs counter, first, that the SCA does not prohibit improper uses of electronic communications after they have already been accessed and thus are no longer "in electronic storage in such system." *See, e.g.*, *Thompson v. Ross*, 2010

WL 3896533, at *4–6 (W.D. Pa. Sept. 30, 2010) (no violation when defendants accessed plaintiff's old email messages on personal laptop's hard drive); *Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1204–05 (S.D. Cal. 2008) (similar); *Garback v. Lossing*, No. 09-cv-12407, 2010 WL 3733971, at *6 (E.D. Mich. Sept. 20, 2010) (no violation when wife's lawyer used information obtained by unauthorized computer hacker in divorce proceedings). Similarly, the Plaintiffs argue that the SCA does not prohibit improper uses of electronic communications that are obtained with valid authorization. *See, e.g., Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F. Supp. 2d 817, 821 (E.D. Mich. 2000) (no violation "for a person with authorized access to the database no matter how malicious or larcenous his intended use of that access" because "[s]ection 2701 outlaws illegal entry, not larceny").

The Plaintiffs point out that there is essentially no dispute that Feldman authorized Bryan to access all his emails. The only contrary fact—Feldman's statement in his declaration that "I told Bryan to limit his search to emails prior to September 13, 2012 and only authorized him to download the emails that were responsive to that search"—was belied entirely by Feldman's contemporaneous emails. App'x at 642. Finally, the Plaintiffs emphasize that no one deceived

26

Feldman into authorizing access to his gmail account. Feldman's only evidence for his claim that Godfrey wanted to "pilfer" his emails is Feldman's own declaration, in which not a single statement indicates that Crowe Horwath deceived Feldman. Further, the Plaintiffs distinguish *Theofel* because the authorization there was obtained by a patently unlawful subpoena to the plaintiffs' ISP, whereas, in this case, Feldman himself granted Crowe Horwath's reasonable request to download his emails.

We affirm. The Plaintiffs are correct that Godfrey's allegedly improper *use* of Feldman's downloaded emails does not implicate the SCA because, once Feldman's emails were downloaded onto Crowe Horwath's computers, they were not "in electronic storage" within the meaning of the statute. *See Cohen v. Casper Sleep Inc.*, 2018 WL 3392877, at *5–6 (S.D.N.Y. July 12, 2018) (citing, *inter alia*, *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511–13 (S.D.N.Y. 2001)); *Garcia v. City of Laredo*, 702 F.3d 788, 793 (5th Cir. 2012). "The general purpose of the [SCA] was to create a cause of action against 'computer hackers (e.g., electronic trespassers).'" *Salton Maxim Housewares*, 94 F. Supp. 2d at 820 (quoting *State Wide Photocopy Corp. v. Tokai Fin. Servs., Inc.*, 909 F. Supp. 137, 145 (S.D.N.Y. 1995)). "[T]he sort of trespasses to which the Stored Communications

27

Act applies are those in which the trespasser gains access to information to which he is not entitled to see, not those in which the trespasser uses the information in an unauthorized way." *Educ. Testing Serv. v. Stanley H. Kaplan, Educ. Ctr., Ltd.*, 965 F. Supp. 731, 740 (D. Md. 1997). "Put another way, the wrongful acts targeted by the Stored Communications Act are those committed while a user is in electronic 'contact' with a computer facility, not those committed after the user has signed off." *Id.*

To the extent that Feldman claims that the review of his emails *after* they were downloaded onto Crowe Horwath's computers violated the SCA, he is incorrect. Feldman contends neither that his emails were being stored on Crowe Horwath's computers "incidental to . . . electronic transmission," nor that Crowe Horwath is an "electronic communication service" that stored his emails "for purposes of backup protection." 18 U.S.C. § 2510(17) (defining "electronic storage"). Thus, at the time Crowe Horwath used Feldman's emails, they were not in "electronic storage" within the meaning of the SCA because they were stored locally on Crowe Horwath's devices for a purpose other than transmission or backup protection. *See Cohen*, 2018 WL 3392877, at *5–6 (collecting cases).

28

Accordingly, to the extent Feldman's SCA claim is based on the post-download review of his emails, the district court properly rejected it.[10]

The district court also properly rejected Feldman's SCA claim because Feldman authorized Bryan to access Feldman's full gmail account. The only indication that Feldman did not authorize Bryan to access his full gmail account comes from Feldman's declaration.[11] We agree with the district court that Feldman's statement is belied by other facts, including contemporaneous emails. The parties agree that, on May 28, Bryan downloaded some 6,500 of Feldman's emails while Feldman was sitting right next to him. On May 30, Feldman wrote to Bryan, in part: "I would like to confirm / memorialize that I gave my assent for you to download my emails only with the agreement that you not read any emails past September 12, 2012." App'x at 566. That email alone—the closest in time to May 28—confirms that Feldman "assent[ed]" to Bryan's accessing his gmail account.

---

[10] Because we hold that Feldman's emails, once downloaded onto Crowe Horwath's computers, were not in "electronic storage" within the meaning of the SCA, we need not consider whether Crowe Horwath's post-download review of Feldman's emails amounts to "access" within the meaning of the SCA. Nor do we consider whether Feldman's emails were in "electronic storage" while they were in Feldman's gmail account.

[11] *See* App'x at 642 ("I told Bryan to limit his search to emails prior to September 13, 2012 and only authorized him to download the emails that were responsive to that search.").

Later emails confirm the same. On June 6, Feldman asked that Bryan "[p]lease . . . confirm our agreement that you limit your review of my emails to the time period I was a director of" YHIL and thanked Bryan for, in Feldman's view, "confirming our agreement to limit your review of my emails." App'x at 572. In response to a reply email from Bryan on June 9, Feldman wrote: "I agreed to let you go through my emails with the understanding that you would put in the date restriction when going through the documents as you said you could not do so during the search." App'x at 574. Finally, Feldman's own reply brief appears to concede that he authorized Crowe Horwath to download all his emails. *See* Appellant's Reply Br. at 5 ("While Feldman provided access to his email account to Crowe Horwath . . . Feldman did not authorize Godfrey or his agents to review all of his email . . . ."). The record clearly reflects that on May 28, 2014, Bryan downloaded Feldman's emails with Feldman's authorization without respect to timeframe.

It is equally clear that Crowe Horwath did not obtain Feldman's authorization through deceit. There is no evidence of deceit in the record. Feldman argues that Godfrey's stated rationale for preserving Feldman's emails—"necessary to preserve YHIL's business records"—was simply pretext

30

for the "secret, unauthorized purpose" of "pilfer[ing] Feldman's communications for future use against him." Appellant's Br. at 33–34. Feldman's only support for those statements comes from his declaration, which simply does not—even inferentially—support that speculation. Furthermore, although Bryan and Feldman may have had a genuine misunderstanding about the scope of review that would take place, no facts indicate that Bryan "tricked" or intentionally misled Feldman. A misunderstanding would not rise to the level of deceit. *See Theofel*, 359 F.3d at 1073 (explaining that only "invited mistakes" that "extend to the essential character of the act itself" can rise to the level of deceit required to vitiate consent) (cleaned up). Indeed, even by Feldman's own account, it was only on June 9 that Godfrey "instructed Crowe Horwath . . . to search my email account" for emails post-dating September 12, 2012. App'x at 642. Whatever Godfrey instructed Crowe Horwath on June 9 had no bearing on the authorization that Feldman gave on May 28. Thus, no rational juror could find that Bryan gained Feldman's authorization by deceit.

B.    Sanctions

This court reviews a district court's imposition of sanctions pursuant to both Rule 37 and the court's inherent power for abuse of discretion. *See Valentin*

31

*v. County of Suffolk*, 342 F. App'x 661, 662 (2d Cir. 2009) (Rule 37); *United States v. Seltzer*, 227 F.3d 36, 39 (2d Cir. 2000) (inherent power). In this case, the Plaintiffs ask us to review the district court's decision *not* to impose sanctions. Although the law is less well developed, we have said that we also review a district court's non-imposition of sanctions pursuant to both Rule 37 and its inherent power for abuse of discretion. *See Momentum Luggage & Leisure Bags v. Jansport, Inc.*, 45 F. App'x 42, 44 (2d Cir. 2002) (Rule 37); *In re Lavender*, 399 F. App'x 649, 652–53 (2d Cir. 2010) (Rule 37); *Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 177–78 (2d Cir. 2008) (remanding because we could not "assess whether the district court properly exercised its discretion" in declining to impose particular Rule 37 sanction); *Sorenson v. Wolfson*, 683 F. App'x 33, 37 (2d Cir. 2017) (inherent power). Those standards of review comport with those of our sister courts.[12] "An abuse of discretion occurs when a district court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions."

---

[12] With respect to Rule 37, *see Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000); *Neiberger v. Fed Ex Ground Package Sys., Inc.*, 566 F.3d 1184, 1191–92 (10th Cir. 2009); *PNC Equip. Fin. v. Mariani*, 758 F. App'x 384, 389 (6th Cir. 2018).

With respect to inherent power, *see Rogler v. Standard Ins. Co.*, 30 F. App'x 909, 914 (10th Cir. 2002); *Cowden v. Chrysler Corp.*, 116 F.3d 483 (9th Cir. 1997) (Table) (unpublished); *F.D.I.C. v. Bender*, 182 F.3d 1, 7 (D.C. Cir. 1999) (remanding unexplained denial of sanctions pursuant to inherent power because decision "requires an explanation").

*Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018) (quoting *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012)) (cleaned up).

In the district court, the Plaintiffs sought sanctions against Feldman pursuant to both Rule 37 and the court's inherent power based on Feldman's alleged perjury and failure to produce documents with respect to (1) the Julius Baer Scheme and (2) the Promneftstroy Scheme. On August 1, 2018, in a written ruling, the district court declined to impose such sanctions. Plaintiffs appeal that decision and argue that it was an abuse of discretion for the district court to decline to impose sanctions. We affirm.

1. *Rule 37*

If a party "fails to obey an order to provide or permit discovery," a district court may sanction the transgressing party in numerous ways of varying severity, up to and including dismissing the action. Fed. R. Civ. P. 37(b)(2)(A). A court may impose sanctions pursuant to Rule 37 only when the transgressing party has violated a prior court order. *See Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991). The Plaintiffs concede that Feldman did not violate such an order. The Plaintiffs argue—circularly and without authority—

that this court should not apply the prior-violation requirement in this case because Feldman's wrongful actions prevented them from making a motion to compel at the appropriate time. No such exception exists, and the district court certainly did not abuse its discretion in declining to impose sanctions pursuant to Rule 37.

### 2. *Inherent Power*

A court may sanction a party under its inherent power to deter abuse of the judicial process and prevent a party from perpetrating a fraud on the court. *See Knox v. United States*, 2016 WL 4033086, at *4 (D. Conn. July 27, 2016); *Shangold v. Walt Disney Co.*, 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006). "Sanctions for fraud are warranted if it is established by clear and convincing evidence that [a party] has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action." *N.Y. Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25, 25 (2d Cir. 2011) (cleaned up). Thus, clear and convincing evidence of bad faith is a prerequisite to an award of sanctions under the court's inherent power.

This court reviews a district court's decision not to impose sanctions pursuant to its inherent power for abuse of discretion. Caselaw and the purpose of courts' inherent power confirm that our review is highly deferential. First, the Plaintiffs cite not a single case in their briefs in which a court of appeals reversed a district court declining to impose sanctions pursuant to its inherent authority. The Plaintiffs also acknowledged at oral argument that they were unable to find such a case. *See* Oral Arg. at 20:45–21:08. We are also unaware of any such case.[13]

Second, a court's inherent power to sanction bad faith litigation abuse "stems from the very nature of courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)) (cleaned up). "Inherent power sanctions 'vindicat[e] judicial authority without resort to the more drastic sanctions available for contempt of court.'" Gregory P. Joseph, *Sanctions: The*

---

[13] In one case, a federal court of appeals *remanded* a case when the district judge declined to impose sanctions without explanation. *See Bender*, 182 F.3d at 7. However, *Bender* is plainly different from this case. The district judge in *Bender* offered no explanation at all in denying a seemingly meritorious request for sanctions. Here, the district court explained its reasons for declining to impose sanctions.

*Federal Law of Litigation Abuse* 535 (6th ed. 2020) (quoting *Chambers*, 501 U.S. at 46). The imposition of sanctions pursuant to a court's inherent authority is truly discretionary. *See Murray v. City of Columbus*, 534 F. App'x 479, 485 (6th Cir. 2013) ("Because the court's inherent power to impose sanctions is discretionary, the court is not required to sanction a party or attorney even if it has determined that some wrongdoing has occurred."). Finally, the Supreme Court has made clear that courts should impose sanctions pursuant to their inherent authority only in rare circumstances. *See Chambers*, 501 U.S. at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion.").

In the discovery context, that discretion should be exercised with even more restraint than usual. Rules 26(g) and 37 "represent the principal enforcement power to punish discovery abuse." Joseph, *Sanctions*, at 558–59. Inherent power sanctions are thus not a primary mechanism by which a party can obtain relief for a discovery abuse: They should serve only as a useful backstop against discovery abuses that do not clearly violate Rules 26(g) and 37.

The Plaintiffs argue that the district court abused its discretion in declining to impose sanctions pursuant to the court's inherent power for Feldman's perjury and unlawful withholding of responsive documents. In support, the Plaintiffs

re-hash the arguments that they raised in the district court:  They point to the same snippets of deposition testimony (described above) and claim that a comparison establishes by clear and convincing evidence that Feldman lied.  The Plaintiffs also argue that the district court erred in relying on impeachment and cross-examination as appropriate alternatives to the imposition of sanctions.

Feldman also re-asserts the arguments that he made below.  Feldman argues first that his testimony was consistent and honest.  With respect to Feldman's claimed ignorance of the "finder's fee" that Julius Baer paid to Merinson, Feldman explains that he understood the Plaintiffs to be asking only if he knew of such an *illicit* payment.  Feldman testified to the same effect at trial.  Seemingly, the jury rejected Feldman's explanation because it found that Feldman had breached his fiduciary duty to the Yukos Group in the Julius Baer Scheme.  Feldman argues further, with respect to his testimony regarding his obligations to Promneftstroy under the cooperation agreements, that his later deposition testimony and trial testimony—even if seemingly incredible to the Plaintiffs—was consistent with his testimony before producing the cooperation agreements.  At trial, the Plaintiffs impeached Feldman on this point, but the jury

37

found that Feldman had not breached his fiduciary duty based on his role in the Promneftstroy Scheme.

Finally, Feldman argues that he did not withhold documents detailing the Julius Baer Scheme, let alone do so in bad faith. First, Feldman points out that it is unsurprising that the Plaintiffs' written discovery requests did not return documents regarding the Julius Baer Scheme because the requests were extremely broad and did not refer to banking relationships specifically or even inferentially. Second, Feldman highlights that he ran all the search terms that Plaintiffs requested (over four dozen) in addition to his own, and those searches returned no documents regarding Julius Baer.

In none of the above instances did the district court believe that Feldman had perpetrated a fraud on the court. The district court acknowledged that some reasonable jurors might conclude that Feldman had perjured himself, and other reasonable jurors might not. That is precisely how it played out at trial: The jury found that Feldman had breached his fiduciary duty to the Plaintiffs with respect to the Julius Baer Scheme and that he had not done so with respect to the Promneftstroy Scheme. The district court made the acceptable choice to leave "questions of fact" and "credibility determinations" to the jury at trial. *See* App'x

at 1257; *Miesenbock v. Chase Bank USA N.A.*, 2008 WL 4923182, at *2 (D. Conn. Nov. 14, 2008) (noting the alternative remedies of impeachment by cross-examination and Rule 37 sanctions). Nothing in the record indicates that the district court abused its discretion by doing so.

C. <u>Jury Instructions</u>

This court applies a "plain error" standard when reviewing unpreserved objections to jury instructions in civil cases. *See Rasanen v. Doe*, 723 F.3d 325, 332 (2d Cir. 2013). On plain error review, this court "will only grant relief if there was '(1) error, (2) that is plain, (3) that affects substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Keeling v. Hars*, 809 F.3d 43, 51 (2d Cir. 2015) (quoting *United States v. Weintraub*, 273 F.3d 139, 145 (2d Cir. 2001)). In other words, "[t]o constitute plain error, a court's action must contravene an established rule of law and go to the very essence of the case." *Rasanen*, 723 F.3d at 333 (cleaned up). A reviewing court should overturn a lower court's decision on plain error review "only . . . with extreme caution in the civil context." *Keeling*, 809 F.3d at 52 (quoting *Rasanen*, 723 F.3d at 333) (cleaned up). "On plain error review," the Second Circuit "typically will not find [plain] error where the operative legal

question is unsettled." *Fabri v. United Techs. Int'l., Inc.*, 387 F.3d 109, 122 (2d Cir. 2004) (quoting *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004)) (cleaned up).

The Plaintiffs claim that the district court erred in instructing the jury that the Plaintiffs were entitled to disgorge Feldman's compensation pursuant to the faithless servant doctrine only if Feldman had breached his duty of loyalty to the Plaintiffs "in substantial respects." Rejecting that position, we affirm: It was not plain error for the district court to instruct the jury as it did because the instruction accurately reflects one of the two prominent branches of New York law articulating the faithless servant doctrine.

When a defendant is found liable under the faithless servant doctrine, a plaintiff is entitled to recover some amount of that defendant's compensation. "New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture," and the New York Court of Appeals has not resolved which one applies in particular circumstances. *See Phansalkar*, 344 F.3d at 201–02. The distinction between the two regards whether a servant's breach of fiduciary duty must be "substantial."

40

The Court of Appeals laid out the first standard in *dicta* in 1885: "[A] disloyal employee forfeits promised compensation only when the 'misconduct and unfaithfulness . . . substantially violates the contract of service.'" *Id.* (quoting *Turner v. Kouwenhoven*, 100 N.Y. 115, 120 (1885)). Under the *Turner* standard, courts have "found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." *Id.* at 201–02. The Court of Appeals articulated the second standard in 1886:

> An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services.

*Id.* at 202 (quoting *Murray v. Beard*, 102 N.Y. 505, 508 (1886)). The *Murray* standard "suggests that misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture." *Id.*

In *Phansalkar*, we noted that "New York courts have not reconciled any differences between" the *Turner* and *Murray* standards "or defined the circumstances, if any, in which one standard should apply rather than the other."

41

*Id.* In *Phansalkar*, we also did not choose between them. *See id.*[14] Since

*Phansalkar*, the New York Court of Appeals has not clarified the difference

between the *Turner* and *Murray* standards. The district court in this case

instructed the jury on the *Turner* standard. The Plaintiffs at no time objected to

that instruction. Thus, this court reviews the jury instruction only for plain error.

The Plaintiffs argue that it was plain error for the district court to instruct

the jury on the *Turner* standard because the *Murray* standard is the correct

articulation of the faithless servant doctrine in New York. Feldman disagrees

and points out that numerous New York courts have relied on the *Turner*

standard in recent years.[15] Feldman has the better of the argument. In

*Phansalkar*, we noted that lower New York courts applied both standards and

that the circumstances in which each standard applied was an open question.

344 F.3d at 202. Feldman is correct that the question remains open. *See, e.g.,*

---

[14] We did note, however, that "the New York Court of Appeals has not mentioned its *dictum* in *Turner*" since *Turner* itself. *Phansalkar*, 344 F.3d at 202. Further, we pointed out that two New York Court of Appeals cases decided since 1886 seemingly accept *Murray*'s rule. *Id.* at 202 (citing *Lamdin v. Broadway Surface Advert. Corp.*, 272 N.Y. 133, 138 (1936); *Feiger*, 41 N.Y.2d at 929). Still, we acknowledged that numerous lower New York courts follow the *Turner* standard. *See id.* at 201 & n.12.

[15] *See, e.g., G.K. Alan Assoc., Inc. v. Lazzari*, 840 N.Y.S.2d 378, 386 (2d Dep't 2007); *Hamlet at Willow Creek Dev. Co., LLC v. Northeast Land Dev. Corp.*, 2010 WL 669241, at *3 (N.Y. Sup. Ct. Feb. 16, 2010); *Sanders v. Madison Square Garden, L.P.*, 2007 WL 1933933, at *3 (S.D.N.Y. July 2, 2007) (citing *Turner* and not *Murray*); *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 466 (S.D.N.Y. 2008).

*Johnson v. Summit Acquisitions, LLC*, 2019 WL 1427273, at *9 (N.D.N.Y. Mar. 29, 2019) (noting that "New York courts apply two alternative standards to faithless servant claims").  Because the circumstances under which the *Turner* and *Murray* standards apply to claims under the faithless servant doctrine remains an unsettled question of law, it was not plain error for the district court to instruct the jury on the *Turner* standard.

The Plaintiffs' alternative argument is also unavailing.  The Plaintiffs argue that it was error for the district court to instruct the jury on the *Turner* standard with respect to the Julius Baer Scheme[16] because no rational trier of fact could find that Feldman's breach of loyalty was not "substantial."  The Plaintiffs note that, under the *Turner* standard, courts "have found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior."  *Phansalkar*, 344 F.3d at 201–02.  According to the Plaintiffs, Feldman's disloyalty in the Julius Baer Scheme was not a "single act" because Feldman authorized "two undisclosed kickbacks" to Merinson "over at least a four month period."  Appellee's Br. at 24–25.

---

[16] The Plaintiffs' alternative argument is limited to the Julius Baer Scheme.  *See* Appellee's Br. at 24 ("[T]he District Court . . . erred in asking the jury whether Feldman's breach of his fiduciary duty of loyalty and good faith *in connection with the Julius Baer Scheme* was 'substantial.'") (emphasis added).

43

The Plaintiffs also emphasize that embezzling $2.6 million must constitute "substantial" disloyalty. The Plaintiffs cite *Morgan Stanley v. Skowron*, 989 F. Supp. 2d 356 (S.D.N.Y. 2013), for support. In *Morgan Stanley*, the defendant was a portfolio manager at Morgan Stanley who "pled guilty to conspiracy to commit insider trading from at least April 2007 through November 2010" and "admitted to selling stocks held by Morgan Stanley's portfolios on the basis of material non-public information, and then lying to the SEC under oath regarding his receipt of such information." *Id.* at 358. The district court granted summary judgment to the plaintiff on its faithless servant claim because, under the *Turner* standard, the defendant's misconduct was "substantial" as a matter of law. *Id.* at 363.

Feldman argues that a rational juror could conclude that Feldman's breach of fiduciary duty in the Julius Baer Scheme was not "substantial." In general, Feldman notes that the jury heard ample evidence indicating that Feldman was a good employee and that, in any event, his misconduct in the Julius Baer Scheme was a single incident (approving Merinson's finder's fee) spanning a period of a few months.

Reasonable minds could disagree about whether the Julius Baer Scheme was a "substantial and material" violation of the duty of loyalty as a matter of

44

law.  Our own precedent does not suggest otherwise.  In *Phansalkar*, we held that Phansalkar's disloyalty was substantial because it was not "limited to a single, isolated incident, but rather occurred repeatedly, in nearly every transaction on which he worked."  344 F.3d at 202.  We concluded that "where disloyalty occurs in four out [of] five of an employee's primary areas of responsibility and continues over many months, it 'substantially violates' the terms of an employee's service."  *Id.*; *see also Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73, 77 (2d Cir. 2010) (holding that it was not error for the district court to conclude that defendant's disloyalty was "substantial" when the defendant had altered "over one hundred weekly reports").

We have set no bright-line rule and agree with district courts in our circuit that have pointed out that New York courts have not "specifically defined" the "material and substantial" standard under *Turner*, thus "leaving it to case-by-case determination whether the employee's conduct so far infringed on her job performance as to constitute a violation of the doctrine."  *Johnson*, 2019 WL 1427273, at *10 (quoting *Sanders v. Madison Square Garden, L.P.*, 2007 WL 1933933, at *4 (S.D.N.Y. July 2, 2007)) (cleaned up).

45

Here, even if Feldman's disloyalty in the Julius Baer Scheme seems "substantial" to us, precedent does not clearly dictate that it was substantial as a matter of law. Indeed, factually analogous precedent is scarce. *Morgan Stanley*, the case on which the Plaintiffs rely, is of limited import here. Most importantly, the defendant in *Morgan Stanley* had already been convicted of a crime and was sentenced to five years in prison. 989 F. Supp. 2d at 358. In this case, a civil jury found Feldman not liable on most of the schemes that the Plaintiffs alleged. And *Morgan Stanley* actually cuts against the Plaintiffs' argument that Feldman's involvement in the Julius Baer Scheme was not a "single act." Indeed, in a criminal proceeding in the *Morgan Stanley* case, the court characterized multiple insider trades as a single instance of faithlessness. *See United States v. Skowron*, 839 F. Supp. 2d 740, 745–46 (S.D.N.Y. 2012) (characterizing Skowron's conduct as an insider trading "scheme," consisting of multiple "trades"); *Morgan Stanley*, 989 F. Supp. 2d at 362 (explaining that "Skowron only admitted to one instance of insider trading"). And, whereas the single act in *Morgan Stanley* went to "the heart of [the defendant's] primary areas of responsibility," Plaintiffs offered no comparable evidence that the Julius Baer Scheme amounted to "the ultimate abuse of [Feldman's] position and privileges." *Morgan Stanley*, 989 F. Supp. 2d at

46

362 (cleaned up). In sum, Feldman's involvement in the Julius Baer Scheme was not necessarily "substantial" as a matter of law. Accordingly, we hold that the district court did not commit plain error by delivering the jury instructions that it did.

D.    Rule 50 Motion

After the close of evidence, Feldman made a motion for judgment as a matter of law on the Plaintiffs' breach of fiduciary duty claims, principally arguing that certain Plaintiffs offered no evidence of compensatory damages, which Feldman argued are "an element of breach of fiduciary duty." App'x at 2590. As relevant here, the Trust did not seek or prove compensatory damages for Feldman's breach of fiduciary duty in the Trust Scheme. Indeed, the money Feldman invested under his own name in the Trust Scheme nearly doubled in value and was returned to the Trust. The four entities in the Yukos Group also did not seek or prove compensatory damages for Feldman's breach of fiduciary duty in the Julius Baer Scheme. The compensatory damages that the Yukos Group entities might have sought to recover had already been paid to them pursuant to a settlement with Julius Baer.

The district court denied Feldman's Rule 50 motion apparently because it believed that compensatory damages were not a required element of a breach of fiduciary duty claim and that, in any event, nominal damages could substitute in the absence of compensatory damages. The district court also may have viewed "recoupment of compensation" pursuant to the faithless servant doctrine as an acceptable substitute for compensatory damages in a breach of fiduciary duty action. Feldman appeals the district court's denial of his Rule 50 motion requesting judgment as a matter of law on the two schemes on which he was ultimately found liable.

Because we believe compensation paid by a principal to a faithless servant can satisfy the "damage" element of a breach of fiduciary duty claim, we affirm the district court's decision to deny Feldman's Rule 50 motion with respect to those entities that paid Feldman compensation. More specifically, we affirm the district court's decision with respect to (1) the Trust in the Trust Scheme and (2) Yukos Capital and YHIL in the Julius Baer Scheme. However, we reverse the district court's decision with respect to the Foundations in the Julius Baer Scheme because there is no evidence in the record that they paid Feldman any compensation, and nominal damages cannot satisfy the "damage" element of a

48

breach of fiduciary duty claim under New York law. We thus remand the case for the limited purpose of entering judgment in favor of Feldman on the Foundations' breach of fiduciary duty claims regarding the Julius Baer Scheme.

This court reviews *de novo* a district court's denial of a Rule 50 motion for judgment as a matter of law. *See Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 51 (2d Cir. 2012) (citing *Parrot v. Guardian Life Ins. Co. of Am.*, 338 F.3d 140, 142 (2d Cir. 2003)). "We will reverse the denial of judgment as a matter of law only if, notwithstanding making all credibility assessments and drawing all inferences in favor of the non-moving party, a reasonable juror would be compelled to accept the view of the moving party." *Id.* (quoting *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 109 (2d Cir. 2002)) (cleaned up). "We may affirm on any ground with support in the record, even if it was not the ground relied on by the District Court." *Palmer v. Occidental Chem. Corp.*, 356 F.3d 235, 236 (2d Cir. 2004).

This court reviews *de novo* the district court's interpretation and application of state law. *Phansalkar*, 344 F.3d at 199 (citing *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000)). "Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or

49

ambiguity." *Id.* (quoting *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994)). In doing so, we give "fullest weight to the decisions of a state's highest court" and "proper regard to the decisions of a state's lower courts," and we also consider "the decisions of federal courts construing state law." *Id.* (cleaned up).

"To state a cause of action to recover damages for breach of fiduciary duty, a plaintiff must allege: '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'" *United States Fire Ins. Co. v. Raia*, 942 N.Y.S.2d 543, 545 (2d Dep't 2012) (quoting *Rut v. Young Adult Inst., Inc.*, 901 N.Y.S.2d 715, 717 (2d Dep't 2010)); *see also Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) ("The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary relationship; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.") (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)). The only issue in this case regards the third element. Even though most New York courts refer to that element as requiring "damages," as we explain below, in our view that element more precisely requires proof of

50

"damage" (harm or injury), and so we refer to it as the "damage" element of a breach of fiduciary duty claim.

Although the New York Court of Appeals has never addressed the issue squarely, we believe that it would hold as follows: When a principal seeks to recover compensation from an unfaithful servant, the principal need not allege damage other than the compensation it paid the servant to satisfy the "damage" element of a claim for breach of fiduciary duty under New York law. The New York Court of Appeals has explained that a faithless servant "is generally disentitled to recover his compensation," even if "the principal suffered no provable damage as a result of the breach of fidelity." *Feiger*, 41 N.Y.2d at 928–29; *see also Diamond v. Oreamuno*, 24 N.Y.2d 494, 498 (1969); *Lamdin v. Broadway Surface Advert. Corp.*, 272 N.Y. 133, 138 (1936) (applying the *Murray* standard and holding that a servant "forfeits his right to compensation for services rendered by him if he proves disloyal"). Indeed, the New York Court of Appeals has said that a plaintiff may assert a claim for breach of fiduciary duty in the *absence* of any allegation of compensatory damages because

> the function of such an action, unlike an ordinary tort or contract case, is not merely to *compensate* the plaintiff for wrongs committed by the defendant but . . . to *prevent* them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in

51

matters which they have undertaken for others, or to which their agency or trust relates.

*Diamond*, 24 N.Y.2d at 498 (quoting *Dutton v. Willner*, 52 N.Y. 312, 319 (1873)) (cleaned up). We have previously extrapolated from that articulation and explained that "[a]n action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995–96 (2d Cir. 1983).

The close relationship and overlap between the breach of fiduciary duty claim and the faithless servant doctrine also indicate that a faithless servant's compensation may satisfy the "damage" element of a breach of fiduciary duty claim. It is true that some lower New York courts and some federal courts treat breach of fiduciary duty claims and claims based on the faithless servant doctrine as doctrinally distinct. *See, e.g.*, *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 524–25 (S.D.N.Y. 2011) ("Unlike a traditional breach of fiduciary duty claim, which requires a showing of actual damages, to prove a violation of New York's faithless servant doctrine, an employer is not obligated to show that it 'suffered . . . provable damage as a result of the breach of fidelity by the agent.'") (quoting *Feiger*, 41 N.Y.2d at 929). But many courts do

not so distinguish the two claims, and some even note that they are essentially the same. *See, e.g.*, *Johnson*, 2019 WL 1427273, at *9 ("Breach of duty of loyalty and violation of the faithless servant doctrine are essentially the same claims, except that under the faithless servant doctrine, the employer need not show that the employee caused damages."); *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009) (noting that "a claim of breach of the duty of loyalty in New York" is "sometimes referred to as the 'faithless servant doctrine'"); *City of Binghamton v. Whalen*, 32 N.Y.S.3d 727, 728 (3d Dep't 2016) (explaining that plaintiff had brought an "action sounding in breach of fiduciary duty seeking to recover all compensation paid to defendant . . . [as] damages under the faithless servant doctrine").

Relatedly, in cases involving both a breach of fiduciary duty claim and the faithless servant doctrine, numerous lower New York courts and federal courts conflate compensation (forfeitable only under the faithless servant doctrine) and "damage" (the third element of a breach of fiduciary duty claim). *See, e.g.*, *City of Binghamton*, 32 N.Y.S.3d at 728, 730 (explaining that the "amount of damages" for the plaintiff's "action sounding in breach of fiduciary duty" was the amount plaintiff "paid defendant . . . in compensation"); *Visual Arts Found., Inc. v.*

53

*Egnasko*, 939 N.Y.S.2d 13, 14 (1st Dep't 2012) (noting that "damages" on the plaintiff's "faithless servant cause of action" were "the amount of compensation" the defendant was paid during the disloyal period); *Beach v. Touradji Capital Mgmt., LP*, 42 N.Y.S.3d 96, 102 (1st Dep't 2016) (explaining that, on a breach of fiduciary duty claim, the principal's "damages are not limited to" a particular loss because "under the faithless servant doctrine," the principal "could seek to recover the compensation it paid to" the servants); *Consol. Edison Co. v. Zebler*, 975 N.Y.S.2d 708 (Table) (N.Y. Sup. Ct. Aug. 20, 2013) (characterizing agent's compensation to be forfeited under faithless servant doctrine as "compensatory damages").

As the above recounting suggests, New York courts are far from clear regarding the contours of—and interplay between—a claim for breach of fiduciary duty and the faithless servant doctrine.  Thus, we encourage the New York Court of Appeals to clarify those boundaries in an appropriate future case. Our review of the caselaw suggests that, when the New York Court of Appeals does clarify those boundaries, it will hold that compensation under the faithless servant doctrine can satisfy the "damage" element of a breach of fiduciary duty claim.

That conclusion allows us to affirm the district court's denial of Feldman's Rule 50 motion with respect to the Trust Scheme. That is because the Trust paid Feldman compensation. We also affirm the district court's denial of the same motion with respect to Yukos Capital and YHIL in the Julius Baer Scheme. Yukos Capital and YHIL paid Feldman compensation, too.

But we must reverse the district court's denial of Feldman's Rule 50 motion with respect to the Foundations in the Julius Baer Scheme because there is no evidence that the Foundations—for whom Feldman worked as a corporate secretary—ever compensated Feldman. Indeed, the Foundations did not seek to recoup any money that they had paid to Feldman. Because the Foundations did not pay Feldman compensation, and because no evidence in the record suggests that they suffered "damage" from Feldman's disloyalty, we **reverse** the district court's denial of Feldman's Rule 50 motion with respect to the Foundations in the Julius Baer Scheme.

The Plaintiffs argue that, because nominal damages can satisfy the "damage" element of a breach of fiduciary duty claim under New York law, the district court's denial of Feldman's Rule 50 motion with respect to the

Foundations was proper. But the Plaintiffs are incorrect: Nominal damages cannot satisfy the "damage" element of a breach of fiduciary duty claim.

Two cases from the New York Court of Appeals establish that rule. In *Connaughton v. Chipotle Mexican Grill, Inc.*, the New York Court of Appeals affirmed the dismissal of the plaintiff's fraudulent inducement claim. 29 N.Y.3d 137, 144 (2017). To prove the tort of fraudulent inducement, a plaintiff must show "injury," or "actual harm." *See id.* at 142, 144 (citing *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996); *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)). In *Connaughton*, the plaintiff's harm consisted of lost future opportunities and potential future expenses, which are too speculative to amount to "actual harm" under New York law. *Id.* at 143. Nor could the plaintiff rely on nominal damages to establish his claim for fraudulent inducement: The *Connaughton* Court explained that the plaintiff was not "entitled to nominal damages" because "[n]ominal damages are not available when actual harm is an element of the tort." *Id.* Thus, the plaintiff had "failed to plead a cause of action for fraudulent inducement." *Id.* at 144. In our view— although, as discussed below, the language is imprecise—*Connaughton* stands for

56

the proposition that nominal damages cannot satisfy the "damage" element of a tort that requires actual harm.

In *Kronos, Inc. v. AVX Corp.*, the New York Court of Appeals considered whether the plaintiff's claim for tortious inducement of breach of contract was time-barred. 81 N.Y.2d 90, 92 (1993). The answer depended on when the tort accrued. Because "damage is an essential element of" tortious inducement of breach of contract, the question was when the plaintiff suffered "damage," or "injury." *Id.* at 94–96. The defendant argued that "all the elements of the tort claim were present" at the time of the contractual breach, which occurred years before any "allegation of damage," because, in relevant part, "the law always infers at least nominal damages at a contractual breach." *Id.* at 94–95. The *Kronos* Court rejected the defendant's position that the breach occurred before "actual injury" because "[t]o recognize [a] nominal damages element of tort claims would be to wrest the cause of action from its traditional purposes." *Id.* at 96. Thus, *Kronos*, like *Connaughton*, stands for the proposition that nominal damages may not satisfy the "damage" element of a tort that requires actual harm.[17]

---

[17] *Kronos* and *Connaughton* also indicate that nominal damages may be available to tort plaintiffs whose claims do not contain as an essential element "actual injury" (or "damage") if the claim protects "an important technical right," such as "a landowner's right to be free of

Because nominal damages cannot satisfy the "damage" element of a breach of fiduciary duty claim, the Foundations cannot rely on the potential availability of nominal damages to establish a claim for breach of fiduciary duty. Thus, it was error for the district court to deny Feldman's Rule 50 motion with respect to the Foundations in the Julius Baer Scheme.

Even though nominal damages cannot satisfy the "damage" element of a breach of fiduciary duty claim under New York law, nominal damages can be available as a remedy, in limited circumstances, to plaintiffs who have *already established* a claim for breach of fiduciary duty but who cannot recover compensable damages. Thus, it was proper for the district court to award nominal damages to the Trust, Yukos Capital, and YHIL. In general, a court may award a plaintiff nominal damages when "a cause of action for a tort exists but no harm has been caused by the tort or the amount of harm is not significant or is not so established that compensatory damages can be given." Restatement

---

trespass." *Kronos*, 81 N.Y.2d at 95 (cleaned up); *see also Connaughton*, 29 N.Y.3d at 143–44 ("[N]ominal damages may be available in an intentional tort case where the plaintiff need not allege harm to maintain an action against [the] defendant."); Lee S. Kreindler, et al., 16 N.Y. Prac. Series, New York Law of Torts § 21:2 (explaining that when a tort case—typically "nuisance and trespass cases"—"involve[s] the technical violation of an important right, the law permits that the right be declared and affirmed despite lack of proof of harm, and disapproval of the violation is voiced through the award of nominal damages."). Because "actual injury"— or "damage"—is an essential element of a breach of fiduciary duty claim under New York law, we view that holding from *Kronos* and *Connaughton* as inapposite.

(Second) of Torts § 907 cmt. a (Am. Law Inst. 1979); *see also* 22 Am. Jur. 2d *Damages* § 8 (explaining that the term "nominal damages" describes "two types of awards: (1) those damages recoverable where a legal right is to be vindicated against an invasion that has produced no actual, present loss of any kind; and (2) the very different allowance made when actual loss or injury is shown, but the plaintiff fails to prove the amount of damages").  It is the second type of nominal damages award—where a cause of action exists but compensatory damages cannot be proved—that is at issue in this case.

New York courts have awarded nominal damages to plaintiffs who proved a breach of fiduciary duty claim but who could not recover compensatory damages.  For instance, in *Brian E. Weiss, D.D.S., P.C. v. Miller*, the court affirmed a nominal damages award to a plaintiff who proved a breach of fiduciary duty claim but whose "proof of damages" made the calculation of damages "too speculative."  564 N.Y.S.2d 110, 111 (1st Dep't 1990).  Indeed, this court has explained that a nominal damages award would be available to a plaintiff who had proved a breach of fiduciary duty claim but could not prove compensatory damages.  *See Action House, Inc. v. Koolik*, 54 F.3d 1009, 1013–14 (2d

Cir. 1995); *see also Juniper Entm't, Inc. v. Calderhead*, 2013 WL 120636, at *5 (E.D.N.Y. Jan. 9, 2013).

Other principles of New York law also indicate that nominal damages must be available in the circumstances presented in this case, particularly to Yukos Capital and YHIL. As already mentioned, had Julius Baer not settled with the Yukos Group for the full amount of their out-of-pocket loss, Yukos Capital and YHIL would have sought to recover that loss from Feldman as compensatory damages for Feldman's breach of fiduciary duty in the Julius Baer Scheme. In New York, a plaintiff may recover nominal damages from a joint tortfeasor even if another joint tortfeasor has already settled with the plaintiff for the full amount of the plaintiff's harm. *See Butler v. Lutheran Med. Ctr.*, 319 N.Y.S.2d 291, 293 (2d Dep't 1971); N.Y. Gen. Oblig. Law §15-108(a) (explaining that a "release or a covenant not to sue . . . one of two or more" joint tortfeasors "does not discharge any of the other tortfeasors from liability"); Lee S. Kreindler, et al., 16 N.Y. Prac. Series, New York Law of Torts § 21:2 ("An award of nominal damages may also be appropriate when the plaintiff's injuries are caused by successive tortfeasors and, after settling with the first tortfeasor, the plaintiff initiates an action against the successive tortfeasor.").

The related principle of avoiding double recoveries also indicates that an award of nominal damages must have been available to Yukos Capital and YHIL. Under New York law, to avoid double recoveries on tort claims, a plaintiff's recovery against a successive, non-settling tortfeasor "will be reduced by the amount of the settlement or the equitable share of the released tortfeasor's liability for damages." Kreindler, et al., 16 N.Y. Prac., New York Law of Torts § 21:4. Thus, New York law indicates that an award of nominal damages is appropriate when a plaintiff establishes a tort claim but cannot recover compensatory damages either because (1) it has already been made whole for its out-of-pocket loss or (2) doing so would result in an impermissible double recovery.

To sum up: The district court did not err in awarding nominal damages to the Trust, Yukos Capital, and YHIL. Each of those plaintiffs established a claim for breach of fiduciary duty, and none of those plaintiffs could recover compensatory damages as an award.[18]

---

[18] The situation arising in this case is unusual. Indeed, it will arise only when: (1) a plaintiff relies on compensation paid to a faithless servant to satisfy the "damage" element to prove a breach of fiduciary duty claim; (2) the judge instructs the jury on the *Turner* standard of misconduct warranting forfeiture, which allows a principal to disgorge the compensation paid to a faithless servant only when that faithless servant was disloyal "in substantial respects," *see*

61

The parties' briefing reveals some confusion regarding the role of nominal damages in tort cases in New York. That confusion is understandable because in this area court decisions have sometimes lacked precision. More specifically, courts sometimes conflate the concept of "damage" (harm suffered) and "damages" (compensation for harm suffered).[19] But those concepts are distinct. *Compare Damage*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Loss or injury to person or property . . . .") *with Damages*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Money claimed by, or ordered to be paid to, a person as compensation for loss or injury . . . ."); *see also* Kreindler, et al., 16 N.Y. Prac., New York Law of Torts § 21:2 (noting that "nominal damages are not generally awarded in tort cases,

---

*Phansalkar*, 344 F.3d at 201; App'x at 2814; and (3) the jury finds a non-substantial breach of fiduciary duty. In such a situation—which arises in this case with respect to the Trust, Yukos Capital, and YHIL—nominal damages are the only remedy available to a plaintiff who successfully proves a breach of fiduciary duty.

[19] For instance, consider the two New York Court of Appeals cases discussed above, *Connaughton* and *Kronos*. In *Kronos*, the New York Court of Appeals described the final element of the tort at issue (inducement of breach of contract) in all the following ways: "actual damages," "injury," "damage," "damages," "actual injury," and "actual loss." 81 N.Y.2d at 94–97. In fact, the *Kronos* Court referred to the element both as "damage" and "damages" in the same sentence: "Since damage is an essential element of the tort, the claim is not enforceable until damages are sustained." *Id.* at 94. Similarly, in *Connaughton*, the New York Court of Appeals again conflated the same concepts. The *Connaughton* Court described the final element of the tort at issue (fraudulent inducement) as: "injury," "actual harm," "compensable damages," and "cognizable damages." 29 N.Y.3d at 142–44. As discussed above, the *Kronos* and *Connaughton* Courts were undertaking an analysis regarding whether the elements of the torts at issue had been adequately pled, *not* whether nominal damages would later be available if the tort were proved. Thus, the *Kronos* and *Connaughton* Courts themselves conflated the concepts of (1) "damage" (harm suffered) and (2) "damages" (compensation for harm suffered).

because it is the *fact of harm or damage* to the plaintiff which completes the tort and creates the legal right to *damages*") (emphases added); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 318 (2d Cir. 1999) (explaining that, because "[t]he central goal of tort law is . . . to compensate persons for the injuries caused by the breach of certain commonly recognized duties," for "the vast majority of torts, injury is . . . a substantive element of the cause of action, and the amount of damages awardable is decided by the amount of injury caused").

It is nevertheless understandable that courts often conflate the concepts of "damage" and "damages" in tort actions because, in most cases, the two concepts overlap entirely. That is, the easiest way for a plaintiff to prove that she suffered "damage" will often be to show that she incurred compensable damages. Indeed, if a plaintiff shows that she suffered an out-of-pocket loss, she has proved both that she suffered "damage" and "damages."

Even if the concepts fully overlap in most cases, they are analytically distinct, and that distinction becomes important in a case like this one. As discussed above, nominal damages cannot satisfy the "damage" element of a tort that requires actual harm, but when the "damage" element is otherwise

established and the plaintiff is not entitled to compensable damages—as in this case—nominal damages are available.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in large part and **REVERSED** in part.  The case is remanded to the district court for entry of judgment in favor of Feldman on the Foundations' claims of breach of fiduciary duty regarding the Julius Baer Scheme.